# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-CA-01651-SCT

**3M COMPANY f/k/a MINNESOTA MINING AND
MANUFACTURING COMPANY**

*v.*

**SIMEON JOHNSON, JAMES CURRY, BOBBY JOE
LAWRENCE AND PHILLIP PATE**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/30/2002 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | HOLMES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DONNA BROWN JACOBS |
| | JOHN C. HENEGAN |
| | W. WAYNE DRINKWATER, JR. |
| | MARGARET OERTLING CUPPLES |
| ATTORNEYS FOR APPELLEES: | SUZANNE GRIGGINS KEYS |
| | PRECIOUS TYRONE MARTIN |
| | ISAAC K. BYRD, JR. |
| | PATRICK C. MALOUF |
| | TIMOTHY W. PORTER |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND RENDERED - 01/20/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE COBB, P.J., CARLSON AND DICKINSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     This asbestos-related case was filed on April 28, 2000, in the Circuit Court of Holmes County by over 150 plaintiffs, including James Curry, Bobby Joe Lawrence, Phillip Pate and Simeon Johnson ("Plaintiffs") against approximately 62 defendants[1], one of which was

---

[1]By the time trial began, only seven defendants remained in the case: ACandS, Inc., Dresser Industries, Inc., General Refractories, Quigley Company, New Harbison-Walker, Guard-Line, and 3M.

Minnesota Mining and Manufacturing Company ("3M"), a manufacturer of protective masks. On September 28, 2000, Judge Jannie M. Lewis entered a Case Management Order which provided that the plaintiffs' counsel were to designate ten plaintiffs among their initial group to be tried jointly against all defendants against whom those plaintiffs in the trial group alleged claims. The defendants moved for a separate trial for each plaintiff, arguing that a joint trial of unrelated claims would be unduly prejudicial; however, the trial court denied the motion. Trial commenced on October 1, 2001, and after three weeks of testimony, the jury returned six separate verdicts based on special interrogatories in favor of each plaintiff for $25 million in compensatory damages.[2] The jury denied the plaintiffs' claims for punitive damages. The trial court denied 3M's post-trial motions including a motion for a judgment notwithstanding the verdict. Therefore, 3M obtained entry of a Miss. R. Civ. P. 54(b) judgment and timely filed this appeal.

## FACTS AND THE PROCEEDINGS IN THE TRIAL COURT

**3M Products:**

¶2.     The 3M products at issue in the case sub judice are the 8500 dust mask and the 8710 disposable respirator. Neither product contains asbestos; however, only the 8710 mask was designed to reduce exposure to respirable fibers, including asbestos. The 8500 mask, first manufactured in 1962, was designed to keep nontoxic nuisance dusts out of the wearer's nose and mouth. 3M claims that it never represented the 8500 mask as suitable for protection from asbestos. 3M's packaging for the 8500 mask stated that the mask was suitable only for non-

---

[2]Immediately before trial, two plaintiffs settled. One plaintiff settled before paintiffs finished their case-in-chief. Another plaintiff failed to testify or offer any other proof and was dismissed.

toxic substances. For toxic dusts and vapors, the packaging directed the user to "use NIOSH/USBM approved masks."[3] However, in 1978, 3M added warnings to the box containing the 8500 mask, cautioning the user not to use the mask around asbestos. 3M later placed this warning on the mask itself.

¶3.     In 1972, 3M introduced the 8710 disposable respirator for protection against pneumoconiosis-producing and fibrosis-producing dusts, including asbestos. The United States Occupational Safety and Health Administration ("OSHA") approved the 8710 respirator for use in environments where exposures to certain substances, including asbestos, did not exceed ten times the permissible exposure limit ("PEL"). Federal regulations required that 3M submit the 8710's packaging, including the instructions and other data, to NIOSH for approval. In 1986, 3M voluntarily withdrew the 8710 respirator for use with asbestos after OSHA reduced the PEL for asbestos from 2 fibers/cc of air to .2 fibers/cc.

**The Plaintiffs:**

¶4.     James Curry, 65 at the time of trial, had worked for various railroad companies for approximately 31 years, beginning in 1957 and ending in 1989. Curry testified that he worked as a laborer, a car helper and a car man, all without wearing a mask or a respirator. For five years, Curry did drywall repair also without respiratory protection. In the late 1960s, Curry began working as a welder. While welding, he wore a mask to protect against welding fumes. Curry testified that he was instructed to wear a mask by his foreman. He also testified that he did not wear any type of mask between the years of 1982 until 1989.

---

[3]NIOSH is the National Institute for Occupational Safety and Health. USBM is the United States Bureau of Mines.

3

¶5.     Curry was examined, at the request of his attorney, by Dr. Obie McNair, a board certified pulmonologist. Dr. McNair diagnosed Curry with pleural thickening[4] and asbestosis caused by exposure to asbestos. However, Dr. McNair placed no restrictions on Curry's activities. Dr. McNair noted in his records that Curry informed him that he did not wear a respirator while working. Curry now performs grounds and building maintenance work. Curry is also able to walk three to four miles per day. Based on the evidence presented at trial, the jury allocated twenty percent of Curry's damage award, or $5 million, to 3M.

¶6.     Simeon Johnson, 53 at the time of trial, testified that he worked for twenty-four years before he became disabled from a knee injury. For fifteen of those years, Johnson worked in environments where he claimed he was exposed to asbestos without respiratory protection. Johnson testified that he only wore a 3M mask during the one year that he worked at Superior Coach. Although Johnson did not work with asbestos products at Superior Coach, he testified that during approximately ten 30-minute periods, he was in the same large building as other workers who used pipe covering and insulating cement.

¶7.     Johnson was also examined by Dr. McNair, who testified that Johnson told him during their visit that he did not use respiratory protection while he worked. Dr. McNair diagnosed Johnson with mild asbestosis and placed no restrictions on his activities. The jury allocated 25 percent of Johnson's damages to 3M—an award of more than $6 million.

---

[4]The pleura is the thin membrane covering the lungs and lining the inside of the chest walls. When the pleura is irritated, adhesions can form, causing the pleural layers to stick together. This condition can be caused by asbestos exposure, pneumonia, tuberculosis or trauma.

¶8.    Bobby Joe Lawrence, 56 at the time of trial, testified that he only wore a mask or respirator while he was working at Ingalls Shipbuilding and Halter Marine. However, Lawrence also worked on automobile brakes for approximately 28 years, but he never wore any respiratory protection. Lawrence's primary job at Halter Marine and Ingalls was sandblasting, for which he wore a full suit and airfed hood.

¶9.    Lawrence was examined by Dr. McNair and was diagnosed with mild pleural thickening. Dr. McNair placed no restrictions on Lawrence's activities. The jury found 3M twenty percent liable for Lawrence's claimed injuries and awarded him $5 million.

¶10.    Phillip Pate, 49 at the time of trial, worked for 23 years until he became disabled by Guillain-Barre syndrome,[5] a neurological condition unrelated to asbestos exposure. Pate testified that during the three years he worked at Medart Lockers he wore a mask or respirator three or four times a year while replacing insulation bricks, and three or four times a month while replacing pipe insulation. Pate also testified that he wore protective masks and respirators while he was employed at Colonial Homes.

¶11.    Pate was examined by Dr. McNair, who diagnosed Pate with asbestosis. Dr. McNair placed no restrictions on Pate's activities based on this diagnosis. The jury allocated 25 percent of Pate's damage award, or more than $6 million, to 3M.

---

[5]Guillain-Barré (Ghee-yan Bah-ray) Syndrome, also called acute inflammatory demyelinating polyneuropathy and Landry's ascending paralysis, is an inflammatory disorder of the peripheral nerves-those outside the brain and spinal cord. It is characterized by the rapid onset of weakness and, often, paralysis of the legs, arms, breathing muscles and face.

**Jury Selection:**

¶12.    During voir dire, prospective jurors revealed that a widespread asbestos campaign had been waged in Holmes County. Venire members disclosed that "informational sessions" had occurred at which attendees were encouraged to bring asbestos claims. Some of the sessions took place in the same courtroom where the trial was being held. These sessions were intended to both recruit asbestos plaintiffs and educate the county about the dangers of asbestos.

¶13.    During these informational sessions, potential plaintiffs were screened for asbestos-related diseases, which usually consisted of a chest x-ray taken by a technician. Sixty percent of the venire admitted to having worked for employers whose employees had been screened. More than ten percent of the venire had been screened. Venire members also testified that they believed "most" of Holmes County had been touched by this campaign. The trial court denied the defendants' motion to strike the venire, grant a mistrial or change venue. The trial court also denied the defendants' request for discovery to determine the scope and effects of the asbestos campaign.

¶14.    Two different venires were required before a jury with alternates could be seated.[6] The trial court initially refused to sustain for-cause challenges based on the first venire members' relationships to the plaintiffs or their counsel or venire members' potential exposure to asbestos. The trial court later sustained such challenges as to the second venire, but did not disqualify some previously-seated jurors on like grounds. However, before voir dire of the second panel, the trial court did reverse its position on challenges for cause and struck those

---

[6]Jury selection began on a Thursday, but so few people appeared that the trial court exhausted the first venire before the court could seat a full jury. The court issued additional summones, and jury selection continued the following Monday with a second venire panel.

jurors chosen from the first venire who had been unsuccessfully challenged for cause based on their having taken part in any asbestos screening.

**The Trial:**

¶15.    Pursuant to the case management order, a ten-plaintiff trial group was selected for trial. Each plaintiff claimed unprotected asbestos exposure in the workplace, and the four plaintiffs at issue in this appeal also claimed protected asbestos exposure which allegedly occurred while wearing respiratory protection. All defendants at trial either made or distributed asbestos-containing products except for 3M, which manufactured respiratory protection equipment. Four plaintiffs claimed that 3M published misleading or insufficient advertisements and product literature about its respiratory products and that the products were defectively designed.

¶16.    At trial each plaintiff testified regarding working in "dusty" working conditions, often without respiratory protection. Although plaintiffs admitted that they did not know that they were working around asbestos and had no knowledge of what products contained asbestos, some mentioned names of manufacturers or products that they allegedly saw at their work sites. No plaintiff, however, offered any evidence that any such product contained asbestos. Furthermore, no plaintiff provided any evidence that he was exposed to asbestos while wearing a 3M product.

¶17. Three expert witnesses testified for the plaintiffs. Dr. David Egilman, an internist who did not examine the plaintiffs, testified generally about the dangers of asbestos. However, he could not offer any testimony that any plaintiff was exposed to asbestos. Nor could he offer any testimony regarding the plaintiffs' medical conditions.

¶18. Dr. Obie McNair examined each plaintiff one time as a screening doctor hired by the Plaintiffs' attorneys. He testified that each plaintiff suffered from an asbestos-related medical condition. In making this determination, Dr. McNair relied on X-rays which he believed showed changes consistent with asbestos exposure and a number of other causes. Dr. McNair also relied heavily on each plaintiff's own statement that he had worked around asbestos, though each plaintiff conceded at trial that this was beyond his personal knowledge. Dr. McNair also testified that plaintiffs' use of respiratory protection was important to his evaluation and that it was his practice to ask about the use of respiratory protection. However, Dr. McNair's records revealed that Simeon Johnson and James Curry denied using respiratory protection. Dr. McNair also testified that if Bobby Joe Lawrence or Phillip Pate had mentioned using respiratory protection, he would have noted it in their records. No such notations appeared in his records.

¶19. Professor Henry Glindmeyer was the plaintiffs' final expert witness. His testimony related to the 3M products at issue–the 8500 dust mask and the 8710 disposable respirator. Professor Glindmeyer challenged the design of 3M's products and criticized 3M's product literature and advertising. However, Glindmeyer was unable to provide testimony that any of the plaintiffs reviewed or relied on any advertisements, packaging or other representation by 3M. There was also no evidence that any of the plaintiffs' employers had done likewise.

¶20. The trial court denied 3M's motion for a directed verdict, and the six plaintiffs' claims were submitted to the jury. During deliberations, it became apparent that the jury would not be able to reach a verdict. The trial court then issued a *Sharplin* charge asking the jurors to re-examine their views, and if appropriate, reach a verdict. *See Sharplin v. State*, 330 So. 2d 591, 596 (Miss. 1976). Thirty minutes later, the jury returned six verdicts, awarding each plaintiff $25 million in compensatory damages.[7] For Johnson and Pate, the jury apportioned fault as follows:

> ACandS: 35%, Dresser: 35%, 3M: 25%, and other companies or individuals: 5%.

For Curry and Lawrence, the jury's apportionment was as follows:

> ACandS: 60%, 3M: 20%, other companies and individuals: 20%.

The jury found for the defendants on the plaintiffs' claims for punitive damages. After the trial court denied 3M's post-trial motions, 3M obtained entry of a final judgment and timely filed this appeal.

## DISCUSSION

### I. Joinder

¶21. In issues regarding improper joinder, this Court employs a deferential standard of review. *Janssen Pharmaceutica, Inc. v. Bailey*, 878 So.2d 31, 45 (Miss. 2004); *Janssen Pharmaceutica, Inc. v. Armond*, 866 So. 2d 1092, 1095 (Miss. 2004). *See also Ill. Cent. R.R. v. Travis*, 808 So.2d 928, 931 (Miss. 2002); *Donald v. Amoco Prod. Co.*, 735 So.2d 161,

---

[7]Each verdict was for the amount and percentage of fault requested by the plaintiffs' counsel in closing argument.

181 (Miss. 1999); *Estate of Jones v. Quinn*, 716 So.2d 624, 626 (Miss. 1998); *Beech v. Leaf River Forest Prods., Inc.*, 691 So.2d 446 (Miss. 1997); *Bobby Kitchens, Inc. v. Miss. Ins. Guar. Ass'n*, 560 So.2d 129, 135 (Miss. 1989); *Miss. State Highway Comm'n v. Rogers*, 240 Miss. 529, 128 So.2d 353, 358 (1961).

¶22.    This Court has recently analyzed Mississippi's joinder criteria in mass tort litigation. *See Janssen Pharmaceutica, Inc. v. Jackson*, 883 So.2d 91 (Miss. 2004); *Janssen Pharmaceutica Inc. v. Keys*, 879 So.2d 446 (Miss. 2004); *Bailey*, 878 So.2d 31; *Janssen Pharmaceutica, Inc. v. Scott*, 876 So.2d 306 (Miss. 2004); *Janssen Pharmaceutica, Inc. v. Grant*, 873 So.2d 100 (Miss. 2004); *Armond*, 866 So. 2d 1092. All involved multiple unrelated plaintiffs alleging personal injury from ingesting the prescription drug Propulsid. In each case, this Court found that the plaintiffs were improperly joined in a single action both for pre-trial purposes and, in *Bailey*, for trial. The decisions are based on this Court's finding that the personal injury claims did not arise from the same transaction or occurrence, even though all plaintiffs took the same drug.

¶23.    For the same reasons, we now find that the plaintiffs in the case sub judice were improperly joined as well, as the only similar trait shared by the plaintiffs is the alleged exposure to asbestos at some point in their work history. The plaintiffs worked in different occupations, for different employers, at different times, were exposed to different products and used different respiratory protection equipment or no respiratory protection equipment at all. Although the plaintiffs were of varying ages, had different work histories, different exposures and different diagnoses, the jury returned identical damage awards.

¶24.    Also, in the case sub judice, the plaintiffs sued multiple defendants based on multiple theories of causation. These defendants were required to defend themselves alongside unrelated defendants. From 3M's perspective, it was the only defendant in the suit which did not manufacture or distribute a product containing asbestos. Therefore, not only were the plaintiffs' claims lacking in a similar transaction or occurrence, but the defendants were improperly joined as well pursuant to Miss. R. Civ. P. 20(a).

¶25.    Rule 20(a) requires that the "causes of action arise out of the same transaction or occurrence" and that "there is a question of law or fact common to all the plaintiffs." *Ill. Cent. R.R. v. Travis*, 808 So.2d at 935. Immediately following the decision in *Armond*, we amended the comment to Rule 20 to clarify the meaning of the phrase "transaction or occurrence." The comment now states that "[t]he phrase 'transaction or occurrence' requires that there be a distinct litigable event linking the parties." Miss. R. Civ. P. 20 cmt.   Although asbestos litigation is a "mature tort" as discussed in dicta in *Armond*, this Court does not intend, nor will we proceed to exempt such cases from the requirements of Rule 20.

¶26.    The plaintiffs argue that the trial court properly made a case-by-case analysis as dictated under Rule 20(a). The plaintiffs likewise argue that the language found in *Armond* deems asbestos cases to be "mature torts" and, thus, not affected by the changes to the joinder rule. The plaintiffs further argue that the jury was not confused or overwhelmed by the amount of testimony offered to prove the six plaintiffs' claims against the seven defendants. Finally, the plaintiffs contend that separate trials would have created an unnecessary expense.

¶27.    3M argues the plaintiffs failed to satisfy both requirements of Rule 20(a). First, 3M argues there is no "common identifiable wrongful act" causally connected to each plaintiff's

11

alleged harm. 3M argues this is evident because the plaintiffs are suing different defendants. Second, 3M contends the factual and legal questions between each plaintiff and the particular defendant or defendants that the plaintiff sued are unique not only to each plaintiff but to each defendant. 3M further alleges that they were prejudiced by the misjoinder which was apparent in the identical jury verdicts for each plaintiff.

¶28.    Following this Court's recent decisions as listed above, we find that the trial court improperly joined the suits of these six plaintiffs and these seven defendants. The joinder did not meet the requirements of Miss. R. Civ. P. 20, in that, these actions do not arise out of the same transaction or occurrence. Although the plaintiffs all allege exposure to asbestos, the plaintiffs worked in different occupations, for different employers, at different times. Some of the plaintiffs used respiratory protection equipment while others did not. Also evident of improper joinder was the identical amounts of damages awarded to each plaintiff. As stated above, each plaintiff had unique medical histories, work histories, differing exposures and differing diagnoses which were presented to the jury. There was also no evidence of any medical bills or expenses provided by the plaintiffs. However, thirty minutes after stating that they were deadlocked and receiving the *Sharplin* charge, the jury awarded each plaintiff $25 million in compensatory damages.

¶29.    In this case, each plaintiff has his own individual combination of facts and evidence surrounding the alleged exposure to asbestos. Also, each plaintiff has his own set of facts as they relate to each defendant. Therefore, there was no single transaction or occurrence connecting all of these plaintiffs to all of these defendants to justify joinder pursuant to Rule 20.    However, this was a products liability case in regards to these four plaintiffs' claims

12

against 3M. Because we also find that these plaintiffs failed to establish a prima facie case showing the elements of a cause of action, this case is reversed and rendered as to these plaintiffs and their claims against 3M. As to the remaining plaintiffs not in the initial trial group, the trial judge shall, consistent with this opinion and our prior cases, sever and transfer the claims of those plaintiffs to an appropriate venue if those plaintiffs elect to proceed to trial. Pursuant to the recent decisions of this Court, the trial court shall also make the appropriate determination as to whether severance is proper as to each defendant against whom a plaintiff alleges a claim.

## II. Motion for JNOV and New Trial

¶30.    The standard of review for a denial of a judgment not withstanding a verdict is well settled. Pursuant to this standard, this Court will:

> consider the evidence in the light most favorable to the [non-moving party], giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the [moving party] that reasonable [jurors] could not have arrived at a contrary verdict, [we are] required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.

*Munford, Inc. v. Fleming*, 597 So.2d 1282, 1284 (Miss. 1992) (citing *Litton Systems, Inc.*, 449 So.2d at 1214.)

> The above standards of review, however, are predicated on the fact that the trial judge applied the correct law. Under the standard of review applicable to discretionary matters, this Court first asks if the court below applied the correct legal standard. *See Detroit Marine Engineering v. McRee*, 510 So.2d 462, 467 (Miss.1987). If the trial court "has exercised its discretionary authority against a substantial misperception of the correct legal standards, our customary deference to the trial court is pretermitted, [citations omitted] for the error has become one of law." *Nationwide Mut. Ins. Co. v. Evans*, 553 So.2d 1117, 1119

(Miss.1989) (citing *Burkett v. Burkett*, 537 So.2d 443, 446 (Miss.1989));
*Southern v. Glenn*, 568 So.2d 281, 284 (Miss.1990); *Gibson v. Manuel*, 534
So.2d 199, 204 (Miss.1988).

*Sperry-New Holland, a Div. of Sperry Corp. v. Prestage*, 617 So.2d 248, 252 (Miss. 1993).

¶31.    A motion for JNOV tests the legal sufficiency of the evidence supporting the verdict,

not the weight of the evidence. *Tharp v. Bunge Corp.*, 641 So.2d 20, 23 (Miss. 1994) (citing

*Goodwin v. Derryberry Co.*, 553 So.2d 40, 42 (Miss. 1989); *Stubblefield v. Jesco, Inc.*, 464

So.2d 47, 54 (Miss. 1984)). *See also* *Corley v. Evans*, 835 So.2d 30 (Miss. 2003). In asking

for a judgment as a matter of law, 3M is asking this Court to hold that the verdict reached by

the jury may not stand. *See* *Jesco, Inc. v. Whitehead*, 451 So. 2d 706, 713 (Miss. 1984)

(Robertson, J., specially concurring).

> Where a motion for j.n.o.v. has been made, the trial court must consider all of
> the evidence--not just evidence which supports the non-movant's case--in the
> light most favorable to the party opposed to the motion. The non-movant must
> also be given the benefit of all favorable inferences that may reasonably be
> drawn from the evidence. If the facts and inferences so considered point so
> overwhelmingly in favor of the movant that reasonable [jurors] could not have
> arrived at a contrary verdict, granting the motion is required. On the other hand,
> if there is substantial evidence opposed to the motion, that is, evidence of such
> quality and weight that reasonable and fairminded [jurors] in the exercise of
> impartial judgment might reach different conclusions, the motion should be
> denied and the jury's verdict allowed to stand. See, e.g., *General Tire and
> Rubber Co. v. Darnell*, 221 So.2d 104, 105 (Miss. 1969); *Paymaster Oil Co.
> v. Mitchell*, 319 So.2d 652, 657 (Miss. 1975); *City of Jackson v. Locklar*, 431
> So.2d 475, 478 (Miss. 1983).

*Jesco, Inc.*, 451 So.2d 713-14.

¶32.    The issue before this Court is whether the plaintiffs met their burden of proof of

showing that the 3M 8500 dust mask and the 3M 8710 respirator were defective when

manufactured. In order to recover in a products liability action based on a design defect, the

14

plaintiffs must prove that at the time the product left the control of the manufacturer or seller: (1) the product was designed in a defective manner; (2) the defective condition rendered the product unreasonably dangerous to the user or consumer; and (3) the defective and unreasonably dangerous condition of the product was the proximate cause of the plaintiff's damages. *See* Miss. Code Ann. § 11-1-63 (Rev. 2002); ***Lane v. R.J. Reynolds Tobacco Co.***, 853 So.2d 1144, 1147-48 (Miss. 2003). Miss. Code Ann. § 11-1-63 (Rev. 2002)[8] states in pertinent part that:

> (a) The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:
>> (I) 1. The product was defective because it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, or
>> 2. The product was defective because it failed to contain adequate warnings or instructions, or
>> 3. The product was designed in a defective manner, or
>> 4. The product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product; and
>> (ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and
>> (iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.
> (b) A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

¶33. At trial the plaintiffs tendered Professor Henry Glindmeyer as an expert in the fields of environmental engineering and health, biomechanical engineering with specialties in

---

[8]Although this statute was amended in 2002, the statute is quoted today as it appeared at the time of the trial of this case.

standards and testing of respiratory protection, the design, manufacture, marketing and effectiveness of specific respiratory protection devices and corporate knowledge and actions in developing, designing, testing and marketing respiratory protection. Glindmeyer admitted he had not been published in the field of asbestos in over forty years and that he had no education or training in the areas of design, warnings, marketing or advertisements. Glindmeyer further stated that he had never tested any respiratory protective device, which includes the two 3M masks in question. As a consultant to respiratory manufacturers, Glindmeyer stated that he did not hold himself out as one who could effectively communicate warning information or instruction information for any products, nor did he hold himself out as one who could effectively communicate through advertising.

¶34.    3M objected to Glindmeyer's qualifications as an expert:

> We renew our motion to exclude his testimony and argue that he has not been qualified in any matter for which he has been offered here. He will not offer relevant testimony to this jury. He does not have qualifications to talk about performance of any respiratory protection device, which is at issue here. He is not a medical doctor and cannot talk about causation issues.
> We don't have anyone who is qualified to talk about design or performance of respiratory protection devices which are at issue in this case, the 8500 and the 8710. What he wants to do is get on the stand and talk about advertising and his belief that if advertising mischaracterized the quality or capabilities of the dust mask at issue. [sic] He has a total lack of qualifications on that issue. He has told the court that he has no training or experience and doesn't hold himself out to be an expert with respect to communications on labeling, packaging, advertising. He's simply not qualified on those areas, Your Honor.

In further challenging Glindmeyer as an expert, the following exchange took place during cross-examination:

> Q.    Isn't that true?  Now with respect to your work, isn't it true, sir, that you have never
> designed --

MS. KEYS: Your Honor, we --

Q. -- a single use respirator?

MS. KEYS: Your Honor, we have gone through this. She asked him repeatedly during the voir dire about what he has done or hasn't done. This is repetitive.

THE COURT: Sustained.

Q. (By Ms. Wells) Dr. Glindmeyer, isn't it true that you have never written warnings?

MS. KEYS: Your Honor, again, we would object. She's just now asking him the same question we objected to.

THE COURT: I don't think it went to warnings.

MS. WELLS: I don't think so either, Your Honor.

THE COURT: Overruled.

MS. KEYS: Yes, Your Honor. She covered everything during voir dire when she challenged his expertise in this area.

THE COURT: Overruled.

Q. (By Ms. Wells) So with respect to writing warnings or instructions, am I correct that you have not ever written warnings or instructions for a single use respirator like the 8710?

A. That's correct.

Q. You've never written warnings or instructions for dust masks; isn't that true?

A. That's correct.

Q. You've never written warnings or instructions for any respirator; isn't that right?

A. Correct.

Q. You've never written warnings or instructions for any product; isn't that right?

A. That's correct.

Q. You've never published professional articles concerning the filtration capabilities of a respirator, have you?

******

A. No.

Q. And you've never published any respirator filtration testing, have you?

A. Not published, no.

******

Q. You've never designed a single use respirator, have you?

******

A. No.

Q. And you've never designed any respirator, have you?

A. Nope.

Q. And you've never manufactured a single use respirator, have you?

A. No.

17

Q. And you've never manufactured any respirator, have you?

A. No.

Q. Dr. Glindmeyer, you have never selected any respirator for any workplace, have you?

A. I have consulted corporations with regard to the selection of respirators at their workplace, but I have never personally selected it because I have never had a workplace.

Q. The answer is no. Is that correct?

******

Q. You've never written a respiratory protection plan, have you?

A. No. I have evaluated them.

Q. You never wore an 8500 or an 8710?

A. I would never think of wearing one.

******

Q. With respect to testing, it's true you have not tested the filtration of the 8500, have you?

A. No, I have not.

Q. You have not tested the filtration of the 8710, have you?

A. Nope.

Q. And you have not tested the filtration of any single use respirator. Isn't that right?

A. No.

Q. Am I correct?

A. Yes, you are correct.

Q. So the answer to the question, whether you have ever tested the filtration of any single use respirator, the answer is no?

A. Correct.

Q. And the same with respect to any respirator, you have not tested the filtration?

A. That's correct, but I have evaluated testing of these products for many years.

Q. . . . Likewise with respect to fit testing for the 8500, the 8710, any single use respirator and any respirator, you have never tested it, have you?

A. No.

Q. My statement was correct?

A. Your statement is correct.

Q. And I have checked the appropriate box here, which is "no" with respect to fit testing of any of those kinds devices, isn't that true?

A. Yes.

Q. Is it true, sir, that no medical doctor or safety director or any employer has told you that he or she was misled by any ad for an 8500 or an 8710?

A. That's correct.

18

It must also be noted that Glindmeyer was hired as an expert eight weeks before trial. In answers to interrogatories submitted to the plaintiffs in November 2000, the plaintiffs stated an expert would testify as to design failure of 3M products. On August 21, 2001, Glindmeyer submitted his report which made no conclusions as to defective design of the 8710. Glindmeyer also did not discuss defective design in his deposition. However, the trial court found 3M was on sufficient notice by the answers to the interrogatories that Glindmeyer would testify as to defective design of 3M's products.

¶35. As an accepted expert in these fields by the trial court, Glindmeyer testified that the marketing materials associated with the 8500 dust mask should have accurately reflected the capabilities of the product. Although Glindmeyer identified several advertisements to which he took exception, he admitted the 8500 dust mask was never advertised as appropriate for use with asbestos. Glindmeyer testified that he believed 3M had a duty to warn affirmatively that the 8500 dust mask was not approved for use around asbestos, and that 3M should have affixed a warning to the mask that said "Don't use around asbestos."

¶36. As to the 8710 respirator, Glindmeyer testified that 3M falsely advertised that the respirator could be used around asbestos and that it was "one-size-fits-all." Glindmeyer testified that 3M did get approval to use the respirator in asbestos areas from the Bureau of Mines; however, Glindmeyer did not approve of the testing performed by the Bureau in making its assessment. Glindmeyer also failed to provide any testimony that the masks did not fit the four plaintiffs.

¶37. Glindmeyer based the majority of his testimony on corporate documents from 3M and on the plaintiffs' own deposition testimony. Glindmeyer did not interview the plaintiffs, their

families, coworkers or visit their work sites. Glindmeyer stated that he could not testify as to any plaintiffs' exposure to asbestos while wearing a 3M mask.

¶38. Bobby Lawrence claimed that he had some exposure to asbestos at Halter Marine Shipyard in Pascagoula where he worked for two years in the 60s. Lawrence had other employment after working at Halter Marine where he did not wear a mask or respirator and may have been exposed to asbestos. Since 1993 he has been working as a mechanic doing brake jobs. James Curry worked for the railroad from 1957 until 1989, and never wore respiratory protection when he worked as a laborer. In the late '70s and early '80s, he worked as a welder and used two different types of respiratory protection. One mask worn by Curry did not fit the description of either the 8500 or the 8710. The second mask had a different color band than was used with the 8500. Curry also performed drywall work between 1965 and 1969 where he was exposed to dust, but he did not use a respirator. Neither Lawrence or Curry testified that they saw a box with an advertisement or a package for the 8500 or 8710 mask.

¶39. Simeon Johnson testified that he used a mask while employed with Superior Coach; however, social security records only show him working between the months of June and September of 1969. While employed at Superior Coach, Johnson did not work with asbestos products; his job was to spray tar onto the sides of school bus panels. Johnson was also employed by John Deere, J.H. Moon doing brake work as a vehicle mechanic, and Medart Lockers where he did not wear protection. From 1980 until 1993, Johnson worked at a newspaper doing maintenance and repair work on boilers where he also did not wear a mask. Phillip Pate was employed by Medart Lockers also, but he stated that he wore protective respiratory masks during his employment. He did not, however, see any packages or boxes with

20

3M on them. Pate was also employed by Colonial Homes and Vintage Enterprises where he did not use respiratory protection.

¶40. As to medical causation, the plaintiffs argue competent expert testimony was offered by qualified witnesses to show that the plaintiffs were injured by 3M products. Dr. Egliman's testimony established that asbestos is a highly toxic substance which causes an incurable, progressive, irreversible disease process in those persons exposed to it. Dr. Egliman also testified that diagnosis with such a disease was proof of exposure to asbestos. He further quantified the future risks faced by persons with the disease. Dr. Glindmeyer testified that based on the plaintiffs' stated use of 3M products and their diagnosis of asbestosis by another physician, 3M's products "contributed to their over exposure because it allowed them to work in dusty conditions for longer periods, but did not protect them from the fine dust that cause lung damage and disease." Finally, Dr. McNair, the only witness who actually examined each plaintiff, testified that he believed each plaintiff was suffering from an asbestos-related disease.

¶41. Plaintiffs alleging a defective design must show by a preponderance of evidence that at the time the product left the control of the manufacturer:

> (I) The manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger that caused the damage for which recovery is sought; and
> (ii) The product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.

21

Miss. Code Ann. § 11-1-63(f). Therefore, plaintiffs have the burden of showing that the "defect that allegedly was the proximate cause of their injury existed at the time that the product left the hands of the manufacturer, and that the defect rendered the product unreasonably dangerous. Accordingly, the proof must support that no material change in that product occurred after leaving the manufacturer's control." **Clark v. Brass Eagle, Inc.**, 866 So. 2d 456, 461 (Miss. 2004). The plaintiffs here were thus required to prove that at the time the 8500 dust mask and the 8710 disposable respirator left 3M's control, there was a feasible alternative design available that would have prevented the harm without impairing the usefulness of the product.

¶42.    The 8500 dust mask was only approved for non-toxic nuisance dusts. 3M did not represent to consumers that the 8500 dust mask was appropriate for protection from asbestos. The 8710 disposable respirator was approved by the Bureau of Mines to be used in areas of known asbestos exposure. However, when OSHA reduced the permissible exposure limit for environments in which the respirators could be used, 3M voluntarily withdrew the 8710 as an approved respirator for use with asbestos. The plaintiffs' expert offered no feasible design alternative to the 8710 disposable respirator which could have been used. The plaintiffs also offered no proof from which a reasonable jury could conclude that an injury was caused by a defect that existed at the time the mask was sold by 3M.

¶43.    To rely on an inadequate warning to establish the existence of a defect, plaintiffs must prove that:

> 1. the manufacturer or seller knew or in the light of reasonably available knowledge should have known about the danger; and
> 2. that the ordinary user or consumer would not realize its dangerous condition.

22

Miss. Code. Ann. § 11-1-63(c)(I).

> An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product ...

Miss. Code Ann. § 11-1-63(c)(ii). There was no evidence presented that any plaintiff that any employer read or relied on any 3M advertisement, brochure, package or label. *See **Rogers v. Elks River Safety Belt Co.***, No. CIV.1:95CV115-D-D, 1996 WL 671316 (N.D. Miss. Sept. 20, 1996) (Even if the operator does not read the warnings, the seller may reasonably assume that they will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.); ***Wyeth Labs., Inc. v. Fortenberry***, 530 So.2d 688, 691 (Miss. 1988) (finding that absent any proof that the warning a patient argues should have been included in a flu vaccine package insert would have caused the doctor not to administer the drug, the warning was irrelevant to liability).

¶44.    Further, in a failure-to-warn case, plaintiffs must prove that the alleged defective warnings rendered the product unreasonably dangerous to the user or consumer; and that this condition proximately caused the damages for which recovery is sought. Miss. Code Ann. § 11-1-63(a)(I), (ii) and (iii). A key element of causation for a failure-to-warn claim is proof of a causal link between the plaintiffs' injuries and the product's allegedly lacking a warning or having an inadequate warning. In other words, the failure to warn must be the proximate cause of the injuries suffered or it is irrelevant. *See **Garner v. Santoro***, 865 F.2d 629, 641, 642 (5th Cir. 1989).

¶45.    The plaintiffs failed to demonstrate that some other warning would have given them additional information that they did not already know and that they would have acted upon that new information in a manner that would have avoided the injuries. The plaintiffs did not demonstrate that any "missing" warning caused the injury. Evidence was presented at trial that the 8500 dust mask was not marketed for use to protect against asbestos, and evidence was also presented that the 8710 disposable respirator had been approved for use in areas of asbestos exposure. No plaintiff testified that they ever read any warnings, or were therefore, misled by any warnings placed on 3M's products. The expert testimony provided by the plaintiffs failed to address and account for the claim of defective design of 3M's products.

¶46.    "If the facts so considered point so overwhelmingly in favor of the [moving party] that reasonable [jurors] could not have arrived at a contrary verdict, we are required to reverse and render." *Corley v. Evans*, 835 So.2d at 37. *See also* *Wilson v. Gen. Motors Acceptance Corp.* 883 So.2d 56, 63 (Miss. 2004); *Steele v. Inn of Vicksburg, Inc.*, 697 So.2d 373, 376 (Miss. 1997); *Bankston v. Pass Road Tire Ctr., Inc.*, 611 So.2d 998, 1003 (Miss. 1992); *McMillan v. King*, 557 So.2d 519, 522 (Miss. 1990). Furthermore, when the plaintiffs fail to establish a prima facie case showing the elements of the cause of action, the entry of a judgment notwithstanding the verdict is proper. *Bankston*, 611 So.2d at 1001. We thus find that the learned trial judge in today's case erred when she denied 3M's motion for JNOV and set aside the verdicts against 3M due to the lack of evidence presented by the plaintiffs to support recoverable damages. Therefore, for the reasons stated above, 3M is entitled to a judgment as a matter of law.

## CONCLUSION

¶47. The trial court erred in denying 3M's motion for a judgment notwithstanding the verdicts which would have set aside the verdicts against 3M due to the lack of evidence presented by the plaintiffs to support recoverable damages. Therefore, 3M is entitled to a judgment as a matter of law. Certainly, in all fairness to the trial judge, she was called upon to make decisions without the benefit of *Armond* and its progeny, decided well after the trial of the case sub judice. However, we have now previously held on numerous occasions that it is improper to join groups of plaintiffs whose claims do not arise out of the same transaction or occurrence. Because each plaintiff has his or her own unique set of facts and circumstances to be presented at trial, this Court cannot find that the claims of these four plaintiffs arise out of the same transaction or occurrence. Therefore, the claims of the remaining plaintiffs not in the initial trial group shall be severed and transferred to an appropriate venue if those plaintiffs elect to proceed to trial. Pursuant to recent precedent, the trial court shall also make the proper determination as to whether severance is proper as to each defendant against whom a plaintiff alleges a claim.

¶48. Again, as to today's plaintiffs, the Holmes County Circuit Court judgments rendered in their favor pursuant to the jury verdicts are reversed, and judgment is rendered here in favor of 3M that plaintiffs Simeon Johnson, James Curry, Bobby Joe Lawrence, and Phillip Pate take nothing from 3M and that their complaint against 3M is finally dismissed with prejudice.

¶49. **REVERSED AND RENDERED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., AND DICKINSON, J., CONCUR. EASLEY AND GRAVES, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. DIAZ AND RANDOLPH, JJ., NOT PARTICIPATING.**