294 So.2d 181 (1974)
EARLY-GARY, INC., and H.J. Heinz Company
v.
W.M. WALTERS.
No. 47494.
Supreme Court of Mississippi.
May 6, 1974.
*182 Thompson, Alexander & Crews, Jackson, Harold W. Melvin, Laurel, for appellants.
Collins & Tew, Laurel, Bowling, Coleman & Cothren, Jackson, for appellee.
INZER, Justice:
This is an appeal by Early-Gary, Inc. and H.J. Heinz Company from a decree of the Chancery Court of Jones County awarding appellee W.M. Walters $15,000 as damages for personal injuries sustained while trying to open a bottle of ketchup.
Appellee instituted this suit by way of attachment in the Chancery Court of Jones County against H.J. Heinz Company, a non-resident debtor, and Early-Gary, Inc., a domestic corporation. Walters sought recovery against H.J. Heinz Company, hereinafter referred to as Heinz, on the theory that it was strictly liable in tort for a defect in a bottle which rendered it unreasonably dangerous and not reasonably safe for its intended use. The suit against Early-Gary, Inc., hereinafter referred to as Early-Gary, was based upon the theory that it was negligent in failing to loosen or remove the cap from the bottle before serving it. The defendants separately answered denying the allegations against them and raising the defense that appellee's own handling of the ketchup bottle was an intervening and superseding cause of the injuries suffered.
*183 The evidence is undisputed that on April 1, 1965, appellee W.M. Walters, a bank examiner, and four other bank examiners went to the Benbow Snack Bar, operated by Early-Gary in the City of Laurel for their evening meal. After they were served the food, Mr. Elia, one of the members of the party, asked the waitress for ketchup. The waitress went to the pantry and obtained an unopened 14 ounce bottle of Heinz ketchup and placed it on the table. Mr. Elia attempted to open the bottle, but could not do so. He handed the bottle to appellee and requested him to open it. Appellee gripped the cap within one hand while holding the bottle with the other and tried to open it, but was unable to do so. No waitress was available at that particular time to assist the men, so appellee, noticing no defects in the bottle, inverted it and holding it by the neck with his left hand, bumped the bottom of the bottle one time with his right hand. The bottom of the bottle broke on impact with the palm of appellee's hand, but the walls of the bottle remained intact and inflicted a severe wound in his hand. Two tendons to the index finger were severed along with a sensory nerve in the thumb. Surgery was required, and appellee suffered a ten percent permanent disability to his hand.
Dr. William B. Hall, a ceramic engineer and professor at Mississippi State University, was tendered and accepted as an expert witness on behalf of appellee. Dr. Hall received a B.S. degree from the University of Texas in ceramic engineering, a M.S. degree from Mississippi State University in ceramic engineering, and a Ph. D. at Mississippi State University in engineering. Glass is one of the divisions of ceramic engineering. Dr. Hall had several courses in glass and had worked in industry for three years and several summers where glass was a part of his work. At the time of this trial, he taught a course at Mississippi State University in glass estate, which encompasses the manufacturing process, the forming, the structure and various compositions of the glass estate. Dr. Hall testified that at the request of appellee, he purchased four, 14 ounce bottles of Heinz ketchup from a supermarket in Starkville. With the aid of a laboratory assistant, he performed a test with the bottles to ascertain if they would break under a hard blow with a hard rubber hammer. The bottles with the caps still intact as purchased from the supermarket were placed neck down in a funnel which was held by Dr. Hall while his assistant struck the bottle on the bottom as hard as he could with the hammer. None of the bottles broke under this test, although each of the bottles was struck several times with the hammer. Dr. Hall also demonstrated to the court how he performed the tests by striking the bottom of one of the bottles with the hammer. In answer to a hypothetical question involving the facts of this case, Dr. Hall was asked if he had an opinion as to the cause of the bottle which appellee bumped with his hand breaking immediately on impact. He said he did, and it was his opinion that there was a defect in the bottle and that the defect occurred prior to the time it was packed for shipment by Heinz.
Mr. Allen C. Skiddle, manager of packaging and materials evaluation for Heinz, testified that he had charge of testing procedures and development of packaging material. Although Heinz does not manufacture the glassware used in bottling of ketchup, it does furnish the specifications and design to which the bottles must conform. He described the manufacturing procedures from the time the bottles are received from the suppliers. Throughout the process tests designed for 95 percent assurance of quality are conducted on bottles selected at random. These tests include both visual inspection and a thermal shock of 40 degrees when the bottle is filled with hot ketchup. After bottling, the product is packaged in cardboard boxes for shipment to customers. The boxes are designed to meet shipping requirements and to meet the Mullen test at 200 pounds. This test is a means of testing the bursting strength of the packaging material. Mr. Skiddle was of the opinion that the breakage of the *184 bottle in question was due to a phenomenon called hydrodynamic breakage, commonly called water hammer. He admitted that the bottle ordinarily will withstand normal tapping on the bottom without breaking due to water hammer. He admitted that television advertisements by Heinz depicted the product as difficult to get out of the bottle and showed people bumping the bottle on the bottom to remove the ketchup from the bottle. However, he pointed out that the bottle cap had been removed from the bottles which were shown, and that water hammer effect could not occur if the cap were loosened or removed.
Daniel J. O'Connell, a licensed consulting engineer, qualified as an expert in the field of glassware and testified on behalf of Heinz. He explained the phenomenon of water hammer or hydrodynamic pressure as follows:
... [T]aking the container first, if I hold a container or any object and hold it fairly steadily and hit it, I set up a stress wave in the object. The stress wave travels down, when it hits the bottom of the object if the object is free, it turns from compression to tension. It is then reflected and comes back to the free end at the other end and again is reflected as tension. The reflection doubles the tensile stress, so we have high stress due to impact. Now the contents are not welded to the bottle and the contents in the bottle tend to move independently of each other. Striking the bottle moves the bottle. When the bottle stops the contents keep going, just as a person in an automobile would be thrown forward when the brakes are put on the car. The contents then moving forward strike again and that again causes an impact, but then something else happens that is quite peculiar. When the contents move forward the pressure on the back of the contents is reduced and it is reduced well below room or atmospheric pressure. As a matter of fact, in a hot vacuum packed material the internal pressure in a bottle is below atmosphere  it is of the order of about twenty inches of mercury, that is, instead of having 14.7 pounds pressure on the inside to balance 14.7 on the outside you have an absolute pressure on the inside of the bottle of approximately five pounds. At low pressures water will evaporate and form a bubble and then when a bottle catches up with the contents or the contents catch up with the bottle, these bubbles break and they cause terrific pressure, but they cause them in the localized spot, very localized and when sufficient, they combine with the other tensile stresses due to the impact to cause a sound container to break. There is no doubt about it.
Mr. O'Connell did no think that the method that Walters chose to loosen the cap on the bottle was a reasonable method. In fact, he was of the opinion that it was the hardest way to remove the cap. He was also of the opinion that the tests performed by Dr. Hall were in reality no test at all. On cross examination, he admitted that defective bottles do come out of manufacturing processes. He said that bruises or scratches reduced the strength of glass, but with a sound bottle, a normal slap on the bottom would not create the water hammer effect or cause breakage. It would take a heavy or severe blow on the base to break a sound bottle without defect. The blow would have to be heavy enough to hurt the hand striking the blow. He admitted that the water hammer effect would tend to loosen the cap but was quick to point out that he would not use the method to remove the cap from the bottle.
The chancellor found from the testimony that the product in question was processed and distributed while in a defective condition and that Heinz knew or was charged with the knowledge that the defective bottle constituted an unreasonable hazard for anyone attempting to use the product in question. He found that the defective bottle was a direct proximate cause of the damage to Walters' right hand.
*185 The chancellor further found that Early-Gary, through its agents, servants and employees, was negligent in failing to open the bottle of ketchup prior to placing it on the table for use by its customers and that this negligence contributed to the accident and injuries involved.
The court found that Walters suffered permanent injuries and damage to his hand together with loss of wages and hospital expense. He fixed the damages at $15,000. A decree was entered in accordance with his opinion.
On appeal, Heinz urges that the trial court was in error in failing to sustain its motion to exclude the testimony of Dr. Hall on the ground that he lacked professional qualifications. It is argued that without this testimony Heinz was entitled to a verdict in its favor. Heinz takes the position that because Dr. Hall was not familiar with the term water hammer and because he had never worked in a glass factory, bottle factory or a food processing plant, he lacked professional qualifications. We find no merit in this contention. In order for one to qualify as an expert in the field, one must be shown to have acquired a special knowledge of the subject matter about which he is called to testify. This knowledge may be obtained by a study of recognized authorities or through practical experience. The question of whether the proffered witness has obtained the required degree of specialized knowledge within a particular field is a matter within the sound discretion of the trial court, and unless there is an abuse of that discretion, his determination will not be disturbed on appeal. Illinois Central R.R. v. Benoit Gin Co., 248 So.2d 426 (Miss. 1971); Gulf, Mobile & Ohio R.R. v. Hollingshead, 236 So.2d 393 (Miss. 1970); and Capital Transport Co. v. Segrest, 254 Miss. 168, 181 So.2d 111 (1965).
Dr. Hall's qualifications heretofore set out in this opinion are such that the chancellor was justified in accepting his testimony as an expert in this field. It is true that Dr. Hall was not familiar with the term hydrodynamic breakage or water hammer, but his testimony revealed that he was familiar with the forces created inside a bottle when it was subjected to an impact. The chancellor had this information before him when he overruled the motion to exclude the testimony, and we cannot say he abused his discretion in doing so. In fact, we are of the opinion that he was amply justified in accepting the testimony of Dr. Hall.
The principal argument by Heinz is that the evidence in this case is not sufficient to support the finding of the chancellor of liability under the theory of products liability. In State Stove Manufacturing Co. v. Hodges, 189 So.2d 113 (Miss. 1966), we held that the standard by which the liability of a manufacturer is measured for injuries received as a result of that manufacturer's product is set out in Section 402A Second Restatement of Torts, and it is as follows:
Special Liability of Seller of Product for Physical Harm to User or Consumer 
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered *186 into any contractual relation with the seller.
(189 So.2d at 118).
Before recovery can be had under this Section three elements must be established by the proof: (1) that the plaintiff was injured by the product, (2) that the injury resulted from a defect in the product which rendered it unreasonably dangerous, and (3) that the defect existed at the time it left the hands of the manufacturer. As to the first element there can be no doubt that Walters' injury resulted from the use of the product of Heinz. The evidence is undisputed in this regard.
As to the second element, we are of the opinion that the chancellor's finding that the injury resulted from a defect in the product rendering it unreasonably dangerous is supported by the evidence. We stated in State Stove, supra, that: "Ordinarily the phrase `defective condition' means that the article has something wrong with it, that it did not function as expected." 189 So.2d at 121.
It is a question of fact whether the particular article involved was reasonably safe when it left the control of the manufacturer. Prosser states that there must be something wrong with the product that makes it unreasonably dangerous to those who come in contact with it. The interpretation of "defective" is stated in Prosser, Law of Torts § 99, at 659-60 (4th ed. 1971), as follows:
The prevailing interpretation of "defective" is that the product does not meet the reasonable expectations of the ordinary customer as to its safety. It has been said that this amounts to saying that if the seller knew of the condition he would be negligent in marketing the product.
The conflicting evidence in this case produced two or more reasonable theories, and the chancellor after considering and weighing the evidence adopted the theory that the injury resulted from a defect in the bottle rendering it unreasonably safe. We cannot say that he was manifestly wrong in so doing.
Third, and finally, the question is whether the defect existed when the bottle left the hands of Heinz. The evidence shows that Heinz shipped its ketchup in cardboard boxes which meet the requirements of Rule 41 of the Railroad Classification and that the bursting strength of the boxes is 200 pounds. Early-Gary received its supply of ketchup from the distributors in the original box, and an employee of the restaurant opened the boxes, checked the order and stored the individual bottles in the pantry. The waitress testified that before the particular bottle in question was served she wiped the bottle off, checked it for cracks and found none. Walters testified that he observed nothing unusual about the bottle, although he and one of his companions were unable to remove the cap. The chancellor found that the defect existed when the bottle left the hands of Heinz and we cannot say from the evidence that he was wrong in so finding.
It follows that Heinz was liable unless it can be said as contended that appellee misused the product so as to absolve Heinz of liability. We recently had an occasion to address ourselves to the question of product misuse in Ford Motor Co. v. Matthews, 291 So.2d 169 (Miss. 1974). We find here as we did there, that the question of misuse is a question of fact. To allow recovery, the chancellor had to find that appellee did not misuse the product or that the unusual use of the product was one that the manufacturer and seller were expected to foresee and guard against.
Although he did not approve of the particular method, one expert witness testified that bumping the bottom of the bottle could help loosen the cap. It is also admitted that advertisements for Heinz ketchup show people bumping the bottom of the bottle. But it was pointed out that the purpose there was to get the product out *187 of the bottle and not to loosen the cap. These facts coupled with other evidence that sound containers without defect would not be broken by bumping them on the bottom with one's hand, support a finding that there was no misuse of the product, or if there was, it was the type of misuse which the seller and the manufacturer might reasonably be expected to foresee and guard against.
We have considered the other points raised and argued by Heinz and find them to be without merit. It follows that the finding of the chancellor of liability on the part of Heinz must be affirmed.
The chancellor found that Early-Gary was guilty of negligence in failing to open the bottle prior to placing it on the table for use by its customers and that this negligence contributed to the accident and resulting injuries. The bill of complaint charged that Early-Gary was liable on the theory of negligence. Therefore, the question is, did the failure of the waitress to loosen or remove the cap from the bottle constitute negligence? The waitress testified that she was told by the manager in serving a new bottle of ketchup to clean the bottle, to check it to make sure there were no broken, cracked, or chipped places in the bottle and to loosen the cap before serving to a customer. She said that she followed the instructions in serving the bottle in question. Her testimony that she loosened the cap was contradicted by Walters and his companion who testified that the cap on the bottle was so tight they could not remove it by holding it by one hand and trying to twist the cap off with the other hand. We are of the opinion that the chancellor was justified in finding that the waitress failed to loosen the cap. But the question remains, would this omission lead an ordinary, reasonable and prudent person to apprehend danger from it or to reasonably foresee that some injury might naturally follow from such omission? While it is customary for those in the business of serving food to the public to loosen the cap on an unopened bottle prior to serving it, this custom is not necessarily based on an apprehension of danger, but more as a convenience to their customers. There is nothing inherently dangerous about removing the cap from a sound bottle of ketchup. Neither was it reasonably foreseeable that some injury might naturally result or follow such omission. The defect in the bottle in question was not known to Early-Gary, and evidently, it could not be discovered by a visual inspection which was the only method that Early-Gary was expected to use. Neither the waitress nor Walters noticed any defect. Under these circumstances, Early-Gary could not be guilty of negligence in placing the defective bottle on the table for use by its customers.
After a careful consideration of the evidence as to the liability of Early-Gary, we are of the opinion that it is not sufficient to support the finding of the chancellor of liability on the part of Early-Gary. Consequently, this case must be reversed as to Early-Gary.
For the reasons stated the decree of the chancery court is affirmed as to H.J. Heinz Company. That part of the decree finding liability on the part of Early-Gary is reversed and judgment entered here dismissing the suit as to it.
Affirmed in part, reversed in part, and rendered in part.
GILLESPIE, C.J., and PATTERSON, SUGG and BROOM, JJ., concur.