WALLER, Chief Justice,
for the Court:
¶ 1. This is a direct appeal from a judgment awarding Huey P. Holmes, plain-tiffiappellee, $875,000 for silicosis-related injuries allegedly caused by a defective respirator sold by the defendant/appellant, Mine Safety Appliances (MSA). We agree with the trial court’s ruling that the complaint was filed within the statute of limitations, and that Holmes was exposed to a harmful level of silica during the relevant time period. But we further find the trial judge erred in denying MSA’s motion for judgment notwithstanding the verdict (JNOV) regarding Holmes’s warnings claim. We also find that MSA is entitled to a judgment as a matter of law regarding Holmes’s design-defect claim because misuse of the respirator materially changed the product’s condition after it left MSA’s control. We therefore reverse and render on these issues.
FACTS AND PROCEDURAL HISTORY
¶2. In 1958, Huey P. Holmes went to work for T.P. Groome breaking up concrete culverts with a jackhammer. Holmes worked for Groome on and off until 1964.[1] During the six years Holmes worked for Groome, he was exposed to dusty work conditions. Groome provided Holmes a respirator that Holmes identified as a Dustfoe 66 manufactured by MSA. Holmes testified that, although he wore the mask, he often ingested so much dust while jackhammering that his mouth would fill with dirt and his spit would become black.[2]
¶ 3. Thirty-eight years later, on December 16, 2002, Holmes was diagnosed with silicosis. Ten days later, on December 26, Holmes filed a products-liability suit against MSA, among others, claiming its product failed to protect him from overexposure to respirable silica. Subsequently, on April 7, 2006, Holmes was dismissed from the suit without prejudice in light of the then-recent changes to Mississippi joinder rules. Holmes refiled his suit against MSA on May 16, 2007. In its answer, MSA asserted that Holmes filed his second suit after the statute of limita-' tions had run.
¶ 4. Later, on December 13, 2007, the parties agreed to a Master Set of Discovery.[3] The defendants then propounded discovery requests to Holmes on January 16, 2008, including requests that Holmes list the dates and resolutions of all prior suits he had filed and to produce all documents related to any prior suit involving the same factual background. After Holmes failed to meet the sixty-day deadline to respond to the master discovery requests, MSA joined a codefendant’s motion to compel on June 6, 2008. The trial court took no action on the motion, and more than a year later on June-24, 2009, MSA filed another motion to compel.
¶ 5. Holmes first answered the Master Set of Discovery on August 11, 2009, but the response was unsigned and unverified. It was not until January 15, 2010 — 670 days after the response was due — that Holmes submitted a signed and verified response.
*446 ¶ 6. On August 9, 2010, MSA filed a motion for summary judgment, arguing Holmes’s second claim was filed after the three-year statute of limitations had run, and that the one-year saving period found in Mississippi Code Section 15-1-69 also had run. Holmes, noting that three years had passed since MSA first raised the limitations issue, argued that MSA had waived the defense.
¶ 7. The trial court denied MSA’s motion for summary judgment, and the case proceeded to trial.[4] The jury returned a judgment in favor of Holmes in the amount of $875,000, finding MSA ninety percent liable and T.P. Groome ten percent liable.[5] MSA appeals, raising six issues, which we rephrase as:
I. Statute of Limitations
A.Whether Holmes’s claims are time-barred because he failed to commence this action within one year of dismissal of his prior-filed suit.
II. Sufficiency of the Evidence
A. Whether Holmes offered any evidence at trial that he was exposed to a harmful level of respirable silica during the relevant time period.
B. Whether Holmes offered any evidence that he or his employer read or relied on any packaging, labels, or warnings provided by MSA, or if they had, they would have acted differently.
C. Whether product misuse materially changed the condition of the respirator after it left MSA’s control, thus barring Holmes’s design-defect claim.
D.Whether Holmes offered any evidence that established MSA knew or should have known in 1958 through 1964 that jackhammering concrete could result in exposure to respirable silica.
I. STATUTE OF LIMITATIONS

Standard of Review

¶ 8. MSA asserts the trial court erred in denying summary judgment based on the statute of limitations and also in denying MSA’s motion for JNOV on the same. When reviewing a trial court’s grant of summary judgment, this Court applies a de novo standard of review. MS Comp Choice, SIF v. Clark, Scott & Streetman, 981 So.2d 955, 959 (Miss.2008). Likewise, this Court applies de novo review of a trial court’s denial of a motion for JNOV. Adcock v. Miss. Transp. Comm’n, 981 So.2d 942, 948 (Miss.2008). “A motion for JNOV is a challenge to the legal sufficiency of the evidence, and this Court will affirm the denial of a JNOV if,” viewing the evidence in a light most favorable to the verdict, “there is substantial evidence to support the verdict.” Id. (citing Johnson v. St. Dominics-Jackson Mem’l Hosp., 967 So.2d 20, 22 (Miss.2007)).
A. Whether Holmes’s claims are time-barred because he failed to commence this action within one year of dismissal of his prior-filed suit.
¶ 9. It is undisputed that Holmes first filed his claim on December 26, 2002, and *447 that Holmes was dismissed from that suit on April 7, 2006. It is also undisputed that Holmes refiled his suit against MSA on May 16, 2007. What is disputed is the impact of the first filing on the statute of limitations and the applicability of the one-year savings statute. That is, did the filing of the initial suit toll the statute of limitations, and if not, was Holmes’s claim saved by the savings statute?

The Parties’ Arguments

¶ 10. MSA argues that, because the trial court dismissed Holmes from his first suit on April 7, 2006, pursuant to Canadian National v. Smith, 926 So.2d 839 (Miss.2006), Holmes had one year from April 7, 2006, to refile his suit against MSA under the one-year saving statute.[6] MSA claims the dismissal of a plaintiff from a lawsuit on the ground that the plaintiff had been misjoined does not toll the statute of limitations, and because Holmes’s suit initially was dismissed pursuant to Canadian National without prejudice and as a matter of form, the Mississippi one-year saving statute applied. Therefore, according to MSA, Holmes’s claims were time-barred because he failed to file his second action within one year of being dismissed from the first suit.
¶ 11. Holmes argues MSA, by waiting 1,061 days before pursuing the statute-of-limitations claim, waived that defense, or, alternatively, that the limitations period was tolled while Holmes’s first suit was pending. Holmes asserts that, when a complaint is filed, the statute of limitations is tolled for the entire pendency of the ease.
¶ 12. So, in this case, according to Holmes, the statute of limitations began to run when he discovered he had silicosis on December 16, 2002. The limitations period then was tolled when Holmes filed suit on December 26, 2002. Therefore, as of December 26, 2002, Holmes had run off ten days of his three-year statute of limitations. Then, when his suit was dismissed on April 7, 2006, the statute of limitations began to run again, and Holmes had 1,085 days remaining on the limitations period in which to refile.[7] Therefore, Holmes argues, his claim is not time-barred because he filed within 1,085 days of April 7, 2006.

Filing a complaint tolls the limitations period.

¶ 13. Not long ago, in a case similar to the one sub judice, this Court held that the filing of a complaint tolls the statute of limitations while a misjoined plaintiffs initial case is pending. Canadian Nat’l/Illinois Central R. Co. v. Smith, 926 So.2d 839, 845 (Miss.2006) (citing Walters v. Stripling, 675 So.2d 1242, 1244 (Miss.1996); Triple Transp., Inc. v. Dickens, 870 So.2d 1195, 1199 (Miss.2004); Deposit Guar. Nat’l Bank v. Roberts, 483 So.2d 348 (Miss.1986); Jeffery Jackson, Encyclopedia of Miss. Law, Laches and Limitations § 44.22 (Dec.2005)); see also Hosp. MD, LLC v. Larry, 138 So.3d 922, 927 (Miss.2014); Sweet Valley Missionary Baptist Church v. Alfa Ins. Corp., 124 So.3d 643, 645 (Miss.2013) (citing Hill v. Ramsey, 3 So.3d 120, 123 (Miss.2009)) (“It is elementary that, unless process is not timely served, the statute of limitations is tolled upon the filing of the complaint, and does not begin to run again until litigation has ended.”); Price v. Clark, 21 So.3d 509, 521 (Miss.2009).
¶ 14. While Canadian National would seem to be dispositive on this point, MSA *448 cites Clark Sand Co. v. Kelly, 60 So.3d 149 (Miss.2011), and Kinsey v. Pangborn Corp., 78 So.3d 301 (Miss.2011), in response. In Clark Sand, the plaintiffs initial claim, like today’s, was part of a silica mass-tort action dismissed pursuant to Canadian National. Clark Sand, 60 So.3d at 153. However, the Clark Sand opinion is easily distinguished. In that case, the original plaintiff died prior to the second suit, and the second claim was brought by his girlfriend before she was appointed as his executrix. Id. The Court therefore held that she was not eligible to take advantage, of the saving statute because she was not a party to the original suit, and, because she brought her wrongful-death action more than three years after the plaintiffs death, that claim was time-barred. Id.; See Miss.Code Ann. § 15 — 1— 69 (Rev.2012) (saving statute can be utilized only by the plaintiff or his or her executor or administrator).
¶ 15. Furthermore, this Court' limited the Clark Sand holding in subsequent cases. In Kinsey v. Pangborn Corporation, the plaintiff joined a mass-action silica suit against various defendants. Kinsey, 78 So.3d at 301. That action was dismissed on April 27, 2006, following changes to the State’s joinder rules. Id. at 303. Prior to the initial action being dismissed, the plaintiff died. Id. at 303. On April 27, 2007, Kinsey, the plaintiffs stepdaughter, refiled the claim as a wrongful-death action. Id. at 304. The defendants moved for summary judgment, arguing the applicable statute of limitations had run. Id. The trial court granted summary judgment and Kinsey appealed.
¶ 16. Addressing the saving statute and the statute of limitations, this Court held that Kinsey’s wrongful-death suit was a separate and independent action from the original suit because Kinsey was never a party to that suit, nor did she file the second suit as the decedent’s executrix. Id. Therefore, because the second independent action was filed more than three years after the plaintiffs death, that claim was time-barred. Id.
¶ 17. In a third case, with essentially the same facts as Clark Sand and Kinsey, this Court found that those two cases simply stood for the proposition that wrongful-death claims were separate and independent from the original suit where the original complaint was never amended to reflect the wrongful-death claims. Empire Abrasive Equip. Corp. v. Morgan, 87 So.3d 455, 464 (Miss.2012).
¶ 18. In all of the above-noted cases, the initial suit was filed by the allegedly injured plaintiff and the subsequent suits were filed as wrongful-death actions by their beneficiaries. Here, Holmes is alive, and there are no “survival-type” or wrongful-death actions involved. Further, in Clark Sand and Kinsey, this Court determined that the subsequent wrongful-death claims were separate and new claims, and that the prior suit filed by the original parties did not toll the statute of limitations for these subsequent suits. See Clark Sand, 60 So.3d at 153; Kinsey, 78 So.3d at 302-04..
¶ 19. Moreover, the current case is the exact situation anticipated by this Court in Canadian National. There, this Court unequivocally provided that claims filed as mass actions but subsequently dismissed due to changes to our joinder rules toll the statute of limitations until the litigation ends. See Canadian Nat’l, 926 So.2d at 845. Therefore, Holmes’s initial complaint tolled the statute of limitations for the entirety of the time that claim was pending, and, as a result, his subsequent suit was not time-barred.[8]
*449 II. SUFFICIENCY OF THE EVIDENCE

Standard of Review

¶ 20. This Court applies a de novo standard of review to a trial court’s denial of a JNOV and will view the evidence in the light most favorable to the nonmoving party. Union Carbide Corp. v. Nix, Jr., 142 So.3d 374, 384-85 (Miss.2014). The Court gives the nonmoving party the benefit of all favorable inferences that reasonably may be drawn from the evidence, and we “will reverse the denial of a JNOV only if the facts are so overwhelmingly in favor of the moving party that reasonable jurors could not have arrived at a verdict against the moving party.” Union Carbide Corp., 142 So.3d at 384-85; SM Co. v. Johnson, 895 So.2d 151, 160 (Miss.2005). If there is no “evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached [a] different conclusion[ ] ... this Court must affirm.... ” Union Carbide Corp., 142 So.3d at 384-85. “[W]e will reverse [only] if the evidence, as applied to the elements of a party’s case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated.” Sherwin-Williams Co. v. Gaines ex rel. Pollard, 75 So.3d 41, 43 (Miss.2011).
¶ 21. In its sufficiency-of-the-evidenee argument, MSA raises four issues. First is whether Holmes offered any evidence at trial that he was exposed to respirable silica or that the level of exposure was harmful. Second is whether Holmes offered any evidence that he or his employer read or relied on any packaging, labels, or warnings provided by MSA, or if they had, they would have acted differently. Third is whether Holmes’s misuse of the product is fatal to his claim. And last is whether Holmes offered any evidence that MSA knew or should have known in 1958 through 1964 that jackhammering concrete could result in exposure to respirable silica.
A. Whether Holmes offered any evidence at trial that he was exposed to a harmful level of respirable silica during the relevant time period.
¶ 22. For Holmes to prevail, he must prove by a preponderance of the evidence that some defect in the Dustfoe 66 respirator was the proximate cause of his injury. Miss.Code Ann. § 11 — 1— 63(a)(iii) (Rev.2014). “Causation may be proven by direct evidence but this type of proof is not essential.... [T]he burden of proof to establish causation may be met by showing sufficient facts to allow a jury to infer defective quality and that such defective quality was a substantial element in producing the injury complained of.” William Cooper & Nephews, Inc. v. Pevey, 317 So.2d 406, 408 (Miss.1975).
¶ 23. This Court in Sherwin-Williams Co. v. Gaines, however, stated that “A dose-response ratio is critical to determining the causal connection between [exposure] and an injury.” Sherwin-Williams Co. v. Gaines ex rel. Pollard, 75 So.3d 41, 46 (Miss.2011). This Court will reject causation evidence where “experts extrapolate[ ] both dose and duration ... only from circumstantial supporting evidence ...,” amounting to merely “engaging in a classic logical fallacy: post hoc ergo propter hoc.” Id.; see also Watts v. *450 Radiator Specialty Co., 990 So.2d 143, 147 n. 9 (Miss.2008) (finding expert testimony on causation unreliable, in part because several of the studies relied on by the expert failed to provide a dose-response ratio).

Holmes’s Argument

¶ 24. Holmes testified that the working conditions while jackhammering were extremely dusty; so much so, that, on occasion, the dust would be so thick he couldn’t see. He said, even while wearing the MSA Dustfoe 66 respirator, he would breathe in large amounts of dust.
¶ 25. Dr. Cameron Huxford, a medical doctor, testified that, because Holmes jackhammered concrete for multiple hours a day, several days a week, for roughly six years, he (Dr. Huxford) was “sure” Holmes was overexposed to silica.
¶ 26. Holmes also called Dr. Vernon Rose, an industrial hygienist, who testified that, in his expert opinion, Holmes was exposed to a harmful dose of silica while working for Groome. Dr. Rose largely based his opinion on an OSHA study that found jackhammering concrete indoors resulted in respirable silica exposure thirty times higher than the permissible exposure level.[9]
¶ 27. Finally, Darrell Bevis, a respiratory protection specialist, testified on behalf of Holmes, stating Holmes was “definitely” exposed to respirable silica because, in Be-vis’s experience, there is almost always respirable silica when one is jackhammer-ing concrete.
¶ 28. Holmes also points to the testimony of two of MSA’s expert witnesses. First, Donald Maraño, an industrial hygienist, testified that sand is a component of concrete; Holmes had multiple doses of respirable silica; and that if Holmes had silicosis, he would have been exposed to a harmful dose. Second, Holmes points to the testimony of Dr. Demondes Haynes, a medical doctor retained by MSA, who testified that six years of exposure to respira-ble silica would be sufficient to cause silicosis.

MSA’s Argument

¶ 29. MSA argues Holmes failed to prove he was exposed to an unsafe dose of respirable silica. MSA notes that silica levels in concrete vary, and there was no evidence at trial about the composition of the concrete Holmes jackhammered, or that Holmes was exposed to an unsafe level of silica. MSA also points out that, in the OSHA study Dr. Rose relied on, two-thirds of the workers were found to have no exposure to an unsafe dose of silica. Additionally, all of Holmes’s experts admitted they did not know the level of silica exposure Holmes suffered. Further, MSA’s expert, Maraño, testified that it was impossible to determine the extent of Holmes’s exposure to respirable silica while he worked for Groome, i.e., while he wore the Dustfoe 66 respirator.

Was the fínding of exposure based on a logical fallacy?

¶ 30. Generally, causation in a products-liability action may be proven through circumstantial evidence. Pevey, 317 So.2d at 408. But, in actions in which a claimant argues he suffered an injury related to exposure to a harmful product, he may not rely on circumstantial evidence which amounts to a post hoc ergo propter hoc finding of a harmful dose. See Sherwin-Williams Co., 75 So.3d at 46. Causation in a products-liability action may not be proven simply by arguing that because Y occurred and subsequently X occurred, *451 that Y caused X. Id. Something beyond a sequential happenstance is required. See id.
¶ 31. In Sherwin-Williams, the plaintiff brought a products-liability claim against a paint manufacturer, arguing her son suffered brain damage due to exposure to the company’s lead-based paint. Id. at 42. To establish that the paint caused the boy’s injury, the plaintiff called three expert witnesses. Id. at 43-44. All three testified the child’s injury was caused by lead exposure. Id.
¶ 32. This Court, however, found the experts’ opinions unreliable because they were contradictory and, to a large degree, based on only two blood samples showing any lead exposure at toxic levels. Id. at 44-46. And, importantly, none of the experts’ opinions were based on any scientific evidence showing a causal link between brain damage and an acute exposure to lead. Id. at 46. Therefore, the experts essentially found that, simply because there was evidence of lead exposure on two occasions, the child’s injury must have been caused by these exposures. See id.
¶ 33. The Court rejected this line of reasoning based on sequential and coincidental evidence, finding it inherently unreliable. The Court held that circumstantial evidence of a post hoe ergo propter hoc nature, without some further evidence of causation, is insufficient to support a products-liability claim. See id. at 46.
¶ 34. In the instant case, we find MSA’s argument that Holmes failed to provide sufficient evidence of causation is without merit. While Holmes failed to offer any direct evidence of the level of exposure, under our holding in Pevey, he is not required to. Pevey, 317 So.2d at 408. A plaintiff may show an unsafe exposure or dose through circumstantial evidence, so long as that evidence is reliable. Pevey, 317 So.2d at 408; see also Sherwin-Williams Co., 75 So.3d at 41.
¶ 35. Here, Holmes offered evidence of extremely dusty work conditions. There was also testimony that concrete contains silica, though no one knows the exact makeup of the concrete Holmes broke up. And Holmes offered testimony that he suffers from silicosis, an injury known to be caused by silica overexposure.
¶ 36. While this evidence possesses a post hoc flavor, there are critical distinctions between the present ease and Sher-win-Williams. But first, it should be noted that the method of diagnosing silicosis is itself, to some degree, a post hoc ergo propter hoc analysis. The parties here did not dispute that the accepted method of diagnosis involves four steps. First, it must be determined that the person was exposed to silica dust. Second, there must be the passage of sufficient time for the disease to develop. Third, an x-ray of the lungs must show abnormalities, i.e., evidence of internal scarring. And fourth, other causes must be ruled out. Therefore, the medically accepted method of diagnosis requires Y to happen (dust exposure) and, after a period of time, for X to occur (silicosis). The only causal connection beyond the passage of time is x-ray evidence of an injury and the ruling out of other possible causes. These two requirements, however, are sufficient to remove Holmes’s evidence from the realm of unreliable coincidence.
¶37. Here, Holmes offered testimony, though not uncontroverted, that his x-rays were consistent with someone with silicosis, which, by its very definition, requires a sufficient dose of silica. Holmes also offered evidence tending to eliminate other sources of the cause of his injury, e.g., no significant smoking history, no evidence of histoplasmosis, and no other potential causes revealed by his x-rays. This type *452 of evidence was almost completely lacking in Sherwiiir-Williams. There, the only evidence in that regard was that of Dr. John Rosen, who testified that he had ruled out any other causes pf the child’s brain injury because nothing in the child’s medical record indicated an “unknown cause.” Sher-win-Williams, 75 So.3d at 44^-45.
¶ 38. Moreover, in the current case, there is no dispute that multiple exposures to respirable silica cause the type of harm Holmes suffered. In Sherwin-Williams, there was no scientific evidence that acute exposure to lead caused subsequent brain damage. Id. at 44. Here, no one disputes that overexposure to silica causes silicosis. Further, Dr. Vernon Rose, unlike the experts in Sherwin-Williams, relied on a scientific study which found jackhammer-ing in an enclosed area resulted in silica dust levels thirty times above the permissible level. While it may be true that two-thirds of the workers in the study were found to have exposure levels within the permissible range, this does not render Dr. Rose’s testimony unreliable. See M.R.E. 702; Miss. Transp. Comm’n v. McLemore, 863 So.2d 31 (Miss.2003).
¶ 39. This study does raise a question, arguably, of the sufficiency of the causal connection. That two-thirds of the workers appear to have been within the permissible dose range suggests it is more- likely than not that jackhammering concrete does not result in overexposure. It would be error, however, to find that this alone defeats Holmes’s claim, because he offers additional evidence of overexposure, the dusty work conditions breaking up concrete, exposure to concrete dust on multiple occasions, his diagnosis of silicosis, etc. Taken altogether, this circumstantial evidence is substantial, such that the trial court correctly denied MSA’s motion for JNOV on this issue. See Adcock v. Miss. Transp. Comm’n, 981 So.2d 942, 948 (Miss. 2008) (providing the Court will affirm the denial of a JNOV if, viewing the evidence in a light most favorable to the verdict, there is substantial evidence to support the verdict).
. ¶ 40. Accordingly, we find the evidence offered by Holmes was sufficiently reliable to rise above a mere post hoc ergo propter hoc finding of causation. Accordingly, this Court finds not only that there was a genuine issue of material fact, but a reasonable juror could have concluded Holmes was exposed to a harmful level of silica.
B. Whether Holmes offered any evidence that he or his employer read or relied on any packaging, labels, or warnings provided by MSA, or if they had, they would have acted differently.
¶ 41. “[RJeliance on the manufacturer’s warning may, or may not, be an element of an inadequate warnings case.” Palmer v. Volkswagen of Am., Inc., 904 So.2d 1077, 1083 (Miss.2005) (emphasis in original); Union Carbide Corp., 142 So.3d at 390. “Such a determination depends on the facts of the case.” Union Carbide Corp., 142 So.3d at 390. Specifically, it depends on whether a plaintiff claims a warning should have been given that was not, or whether the plaintiff claims that the warning that was given was inadequate. Id. If the plaintiff argues that a warning not given should have been given, “reliance is not an element of an inadequate warnings case.” Id. (citing Palmer, 904 So.2d at 1083). This is because it would be absurd to require a plaintiff to show reliance on a warning where no warnings were given. Id. But where “a plaintiff complains that a given warning was defective, the plaintiff must have read and relied upon the defective warning to complain of it.” Id.
*453 ¶ 42. The current allegation is that the warnings MSA provided were defective because they failed to warn of risks associated with using the Dustfoe 66 respirator around respirable silica and in humid conditions. This Court addressed this issue in Palmer v. Volkswagen of America. In that case, the plaintiff argued Volkswagen provided an inadequate warning in an owner’s manual, but the plaintiff had never read the manual. Palmer, 904 So.2d at 1083. After noting that this was an issue of first impression in Mississippi, the Court cited approvingly five cases from other states either overturning jury verdicts or affirming grants of summary judgment where warnings were given but the plaintiff never read them. See id. Simply put, where a plaintiff alleges that the warnings provided were inadequate, the plaintiff must show he relied on those warnings. See id. If the plaintiff fails to do so, the defendant is entitled to a judgment as a matter of law. See id.
¶ 43. It is undisputed in Holmes’s ease that the Dustfoe 66 respirator came with instructions. Yet Holmes proffered no testimony whatsoever that he or Groome read the instructions, or that, had the instructions contained a use limitation or warning, that such a warning or limitation would have altered Holmes’s or Groome’s behavior. Holmes simply argues the warnings provided by MSA were inadequate. And, as this Court stated in Palmer, “Inadequate warnings cannot serve as the proximate cause of injuries where adequate warnings would have resulted in the same injuries.” Palmer, 904 So.2d at 1094. That is, where a plaintiff fails to show the warning provided was the proximate cause of his injury, the defendant must prevail as a matter of law. See id.
¶ 44. The dissent’s argument that MSA provided no warning is incorrect. It is clear from the record that a warning was provided. The dissent even quotes from the warning. To argue no warning was provided because the warning that was provided lacked certain content is a misreading of our caselaw and is contrary to the confessed proof in the record. Even had the instructions provided with the Dustfoe 66 respirator contained every word Holmes alleges they should have contained, there was no evidence whatsoever this would have changed Holmes’s behavior.
¶ 45. And the dissent’s reliance on Union Carbide Corp. v. Nix is likewise misplaced. There, the Court provided that, for a plaintiff to prevail on an inadequate-warnings claim, “the plaintiff must have read and relied upon the defective warning. ...” Union Carbide Corp., 142 So.3d at 390. Nix claimed that the warning provided by Union Carbide inadequately warned of the risks associated with the product at issue. And, importantly, Nix testified that he read the warnings provided and that he would have changed his behavior had the warnings been adequate; that is, he detrimentally relied on the inadequate warnings given. Union Carbide Corp., 142 So.3d at 381. In the current case, Holmes made no such showing.
¶ 46. Accordingly, we find the trial court erred in failing to grant MSA’s motion for JNOV regarding Holmes’s failure-to-warn claims, and we reverse and render on this issue.
C. Whether product misuse materially changed the condition of the respirator after it left MSA’s control, thus barring Holmes’s design-defect claim.
¶ 47. The Mississippi Products Liability Act (MPLA) requires the plaintiff to show that the product at issue endured no material change after the product left *454 the manufacture’s control. Miss.Code Ann. § 11-1-63 (Rev.2014) (providing a manufacturer shall not be liable if the claimant does not prove by the preponderance of the evidence that the alleged defect existed at the time the product left the control of the manufacturer); 3M Co. v. Johnson, 895 So.2d 151, 165 (Miss.2005) (citing Clark v. Brass Eagle, Inc., 866 So.2d 456, 461 (Miss.2004)). A plaintiffs misuse of a product, under certain circumstances, clearly can produce a material change in the product. See, e.g., Dykes v. Husquarna Outdoor Products, N.A., Inc., 869 F.Supp.2d 749, 758-59 (S.D.Miss.2012) (granting summary judgment for defendant where plaintiffs misuse produced a material change in the condition of the product after it left the defendant’s control). Here, Holmes testified that he never once changed the filter in his Dustfoe 66 respirator. MSA argues that this misuse of the mask; because it materially changed the product’s condition, is fatal to Holmes’s design-defect claim.
¶ 48. In Mississippi, if a jury determines a plaintiffs injuries resulted from product misuse, or that misuse rendered the product materially different from the condition it was in when it left the manufacturer’s control, then the plaintiff is the proximate cause of the injuries and the. manufacturer is not liable. See Early-Gary, Inc. v. Walters, 294 So.2d 181, 186 (Miss.1974) (stating, to recover, plaintiff must “not misuse the product or that the unusual use of the product was one that the manufacturer and seller were expected to foresee and guard against.”); Hageney v. Jackson Furniture of Danville, Inc., 746 So.2d 912, 919 (Miss.Ct.App.1999); see also Dykes, 869 F.Supp.2d at 758-59.
¶ 49. This rule attempts to apportion fairly the costs of the harm arising out of the use of a product. If the manufacturer was free from liability when injuries resulted from the use of its product, the manufacturer would have a diminished incentive to design the product in a reasonably safe manner or to provide adequate instructions or warnings. See W. Landes and R. Posner, The Economic Structure of Tort Law 62, 292 (Cambridge, Harvard Univ. Press, 1987). Similarly, if the end user could always recover damages from a manufacturer, regardless of the misuse of the product, customers, beyond concerns of self-preservation and the like, would have little incentive to ensure they used the product properly. Id. at 292. As a result, our law strives to find the proper balance in fault allocation, i.e., the rule promotes the social goal of both manufacturers and customers exercising due care. See Newman, 656 So.2d at 1202; Walters, 294 So.2d at 186; see also W. Landes and R. Posner, The Economic Structure of Tort Law 292. As a result, our rule will bar recovery when a jury finds the plaintiffs unforeseeable misuse of the product substantially changed the condition of the product, and that change, and not the alleged defect, is the proximate cause of the alleged injury. See Newman, 656 So.2d at 1202; Johnson, 895 So.2d at 165; Dykes, 869 F.Supp.2d at 758-59 (finding plaintiffs misuse rendered the product substantially different from the condition it was in when it left the manufacturer’s control, thus barring plaintiff from recovery).
¶ 50. But, where a jury ignores product misuse, the purpose of the law is thwarted. In the case before us today, Holmes unequivocally testified that he never changed the filter in his respirator during the entirety of his employment with T.P. Groome. This is despite uncontradicted testimony that the respirator was sold with replacement filters, and that the filters should have been changed regularly for the device to function properly.[10] Yet, the *455 jury returned a verdict in favor of Holmes, finding MSA ninety percent at fault and T.P. Groome ten percent at fault.
¶ 51. The closest Holmes’s testimony came to being contradicted was by two experts; one for Holmes, the other for MSA. Holmes’s expert testified that no filter on the market could “last through that,” and that he personally found it hard to believe Holmes used just one filter for such an extended period of time, implying he thought Holmes was not truthful on this point. The second witness, MSA’s expert, testified that he thought it was probably impossible, absent some extenuating circumstance, that Holmes did not change filters during the time he worked at T.P. Groome. These experts, of course, had no personal knowledge of whether Holmes changed the filter or not, and this was merely unsupported speculation. In short, there was no evidence that contradicted Holmes or even tended to show that the filter did not survive the full duration of Holmes’s employment at T.P. Groome.
¶ 52. This presents the Court with the question — can a jury disregard substantially unrefuted testimony regarding product misuse, which altered the product’s condition, and return a verdict finding the defendant ninety percent liable? In this particular case, we must answer this question in light of our standard of review for the denial of JNOV. That is, was there “evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached [a] different conclusion! ]?” Union Carbide Corp., 142 So.3d at 384-85.
¶53. Here, Holmes unequivocally said he never replaced the filter. In fact, he said the only maintenance he ever performed on the filter was to remove it from the respirator and brush it off when it became clogged. He would then just place that same filter back in the respirator. This is despite the fact that the instructions provided with the mask informed the wearer that when he or she noticed resistance when breathing through the respirator, this was an indication that the filter needed to be replaced. And, as MSA’s expert noted without contradiction, this generally would occur in days to weeks, depending on the level of dust exposure.
¶ 54. Additionally, when asked if he ever requested new filters from anyone at T.P. Groome, Holmes said he did, but that his employer “would cuss you out.” Moreover, the dissent’s argument that one can infer from MSA’s cross-examination of Holmes that someone may have provided Holmes with replacement filters at some unspecified time is of no moment. First, Holmes unequivocally testified that Groome never gave him a replacement filter, and no testimony at trial contradicted this. Second, and more importantly, even if one believed that Holmes had been given a replacement filter at some point, Holmes emphatically testified, without contradiction, that he never once replaced the filter. And Holmes’s own expert, Bevis, testified that, regardless of the respirator used, if the filter was not replaced regularly, it would offer no protection from respirable silica.
¶ 55. On appeal, Holmes argues product misuse “is essentially an apportionment argument,” and that the jury considered this evidence and apportioned ninety percent of the fault to MSA and ten percent to T.P. Groome. Holmes also argues that the jury is responsible for determining proximate cause and weighing the evidence, and because the jury found in favor *456 of Holmes, the verdict must be upheld. We find this argument unpersuasive.[11]
¶ 56. It is true that whether misuse of a,product caused the plaintiffs injury or not generally is a jury question. Materials Transp. Co. v. Newman, 656 So.2d 1199, 1202 (Miss.1995). It also is correct that the jury “has the right to evaluate and determine what portions of the testimony of any witness it will accept or reject....” Wells Fargo Armored Serv. Corp. v. Turner, 543 So.2d 154, 156 (Miss.1989). But, where “it is clear to this Court that the verdict is contrary to the overwhelming weight of the credible testimony, this Court will ... set aside the verdict of a jury.” Id. Further, “[w]hen the testimony of a witness is not contradicted, either by direct evidence or by circumstances, it must be taken as true.” Hearin-Miller Transporters, Inc. v. Currie, 248 So.2d 451, 454 (Miss.1971) (quoting Stewart v. Coleman & Co., 120 Miss. 28, 81 So. 653 (1919)).
¶ 57. In Hearin-Miller Transporters, Inc. v. Currie, this Court faced an issue similar to that presented today. In Cur-rie, the plaintiff and the defendant were in an automobile accident, and the question before the Court was whether the defendant had crossed the center line. Currie, 248 So.2d at 452. The defendant, whom the plaintiff called as an adverse witness, was the only eyewitness who testified. Id. He stated he had never crossed the center line prior to the accident. Id. The truck’s skid marks were all on his side of the road as well. Id. The only evidence that the defendant crossed the center line prior to the wreck was that his truck came to rest on the wrong side of the road. Id. Nevertheless, the jury returned a verdict in favor of the plaintiff. Id. Finding the defendant’s testimony was substantially uneontradict-ed, this Court reversed and rendered in favor of the defendant, stating uncontra-dicted testimony that is not impeached or “contradicted by the circumstances, must be accepted as true.” Id. at 454.
¶ 58. Here, there is no evidence contradicting Holmes’s testimony. Accordingly, this Court must accept as true Holmes’s testimony that he used only one filter for the duration of his employment at T.P. Groome. Id. As a result, we find Holmes’s testimony overwhelmingly shows the respirator was misused, and that this misuse materially altered the product’s condition after it left MSA’s control. See Dykes, 869 F.Supp.2d at 758-59.
¶ 59. The MPLA places the burden on the plaintiff to show that the product has not been substantially changed after it left the manufacture’s control. Miss.Code Ann. § ll-l-63(a) (Rev.2014); Johnson, 895 So.2d at 165. But here, Holmes clearly failed to make this showing. Instead, the evidence that Holmes never changed his filter overwhelmingly shows that his respirator was not in the same condition as when it left MSA’s control, and, as a result, Holmes failed to show MSA was the proximate cause of Holmes’s injury. See id.; Dykes, 869 F.Supp.2d at 758. In fact, all the expert witnesses agreed that the filter would be ineffective in a matter of days to weeks, and that no filter on the market at the time would have provided Holmes adequate protection if not replaced.
¶ 60. In sum, the evidence regarding misuse and the altered condition of the product was of such quality and weight that no reasonable and fair-minded juror could have reached the conclusion that MSA was at fault for Holmes’s injury. See Union Carbide Corp., 142 So.3d at 384-85. *457 MSA had no control over the user’s failure to follow the instructions it provided. See id; see also Burton by Bradford v. Barnett, 615 So.2d 580, 582 (Miss.1993) (providing liability must be allocated in accordance with each parties’ fault). And the evidence overwhelmingly shows the misuse of the product rendered substantial changes to the respirator after it left MSA’s control. As a result, we reverse the trial court’s denial of MSA’s motion for JNOV and find MSA is entitled to a judgment as a matter of law. See Johnson, 895 So.2d at 167 (providing where a plaintiff fails to show an essential element of his cause of action and the trial court fails to enter a judgment notwithstanding the verdict, this Court is required to reverse and render).
D. Whether Holmes offered any evidence that established MSA knew or should have known in 1958 through 1964 that jackhammering concrete could result in exposure to respirable silica.
¶ 61. The issue of whether MSA had a duty to warn of the specific silica risk associated with jackhammering concrete is rendered moot by our finding that Holmes never read or relied on the warnings MSA provided. See Palmer, 904 So.2d at 1094 (providing inadequate warnings cannot be the proximate cause where the plaintiff never read or relied on the warnings provided). Because Holmes failed to show proximate cause regarding his warnings claims, we need not address whether MSA’s duty was to warn of silica exposure specifically from jackhammering or just respirable silica in general. See Johnson, 895 So.2d at 167 (noting where a plaintiff fails to show any essential element of his cause of action, judgment should be rendered in the defendant’s favor).
¶ 62. Likewise, the misuse and alteration of the mask renders the issue of whether MSA had a duty to design the Dustfoe 66 respirator specifically to protect users from respirable silica produced by jackhammering concrete, or from res-pirable silica generally, is moot. See Early-Gary, Inc., 294 So.2d at 186 (suggesting where misuse is the proximate cause of the harm suffered, that is a complete defense to liability, regardless of any defective condition); Johnson, 895 So.2d at 167 (noting where there is a failure to show any essential element of a cause of action, a defendant is entitled to judgment as a matter of law). This is because Holmes, due to the misuse of the respirator and its altered condition, failed to show MSA was the proximate cause of his injury. And, because Holmes failed to show an essential element of his design-defect claim, we need not address MSA’s duty in this regard. See Johnson, 895 So.2d at 167.
CONCLUSION
¶ 68. For the reasons stated above, we find the trial court correctly denied MSA’s motion for JNOV regarding the statute of limitations and on the issue of silica exposure. But we also find the trial judge erred in denying MSA’s motion for JNOV regarding Holmes’s inadequate-warnings claim and on the issue of misuse and altered condition of the Dustfoe 66 respirator, as it relates to Holmes’s design-defect claim. Therefore, we reverse the trial court’s denial of JNOV on these issues and render judgment in favor of MSA on the same.
¶ 64. REVERSED ■ AND RENDERED.
DICKINSON AND RANDOLPH, P.JJ., LAMAR, PIERCE AND COLEMAN, JJ„ CONCUR. KITCHENS, J., DISSENTS *458 WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER AND KING, JJ.

. While Holmes testified that he worked for T.P. Groome from 1958 through 1964, social security records show he was employed by Groome only in 1958 and 1959.

. Holmes testified the respirator provided by Groome "looked just like” the Dustfoe 66. He also testified that, on occasion, while doing various work for Groome, he would wear a paper mask or no mask at all.

.Because of the large number of original defendants in this case, the parties agreed that the defendants would consolidate their initial discovery requests in a Master Set of Discovery.

. After the trial court denied MSA's first motion for summary judgment, MSA filed an interlocutory appeal, which this Court denied. Subsequently, MSA again joined a motion for summary judgment regarding the statute of limitations. The trial court again denied the motion, and this Court once more denied permission to appeal.

. The award included medical damages, although Holmes offered no evidence of any past or future medical expenses.

. See Miss.Code Ann. § 15-1-69 (Rev.2012).

. Holmes's claim is subject to the general statute of limitations in Section 15-1-49, which is three years, or 1,095 days. Miss. Code Ann. § 15-1-49 (Rev.2012).

. Because Holmes’s suit was not time-barred under the general statute of limitations, the question regarding the saving statute is moot. Likewise, the question of whether MSA waived the limitations defense also is moot. Therefore, we will not address either issue.

. Dr. Rose’s opinion also was based on Holmes’s testimony about his working conditions inside large culverts breaking up concrete.

. The filters at issue were electrostatically charged, which allowed the filter to attract *455 and hold particles. These filters required frequent replacement because, as they lost their electrostatic charge, they provided diminished protection.

. Holmes does not make the argument that his misuse of the respirator was reasonably foreseeable, thus, this Court will not address this prong of the misuse analysis.