# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-CA-00551-SCT

*TOMMY BROOKS OIL COMPANY*

*v.*

*JERRY WILBURN AND WILBURN OIL COMPANY, INC.*


| | |
|---|---|
| DATE OF JUDGMENT: | 04/29/2022 |
| TRIAL JUDGE: | HON. JOHN R. WHITE |
| TRIAL COURT ATTORNEYS: | ALBERT G. DELGADILLO |
| | KEVIN ALAN ROGERS |
| | MARTHA BOST STEGALL |
| | WALTER D. WILLSON |
| | MICHAEL D. GREER |
| | MICHAEL PAUL MILLS, JR. |
| | WILLIAM C. SPENCER, JR. |
| | WILLIAM C. SPENCER |
| | RANDY DEAN |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WALTER D. WILLSON |
| | KEVIN ALAN ROGERS |
| ATTORNEYS FOR APPELLEES: | MICHAEL D. GREER |
| | WILLIAM C. SPENCER |
| | WILLIAM C. SPENCER, JR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | ON DIRECT APPEAL: REVERSED AND REMANDED. ON CROSS-APPEAL: AFFIRMED - 03/21/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., BEAM AND CHAMBERLIN, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. Following a jury trial, the Lee County Circuit Court entered two separate judgments in favor of defendants Wilburn Oil Company and Jerry Wilburn individually. Plaintiff

Tommy Brooks Oil Company had sued Wilburn Oil seeking $984,078.02 under an open account for the purchase and delivery of fuel products to Wilburn Oil. Brooks Oil had also sued Jerry Wilburn individually for enforceability of two guaranty agreements amounting to $250,000. Brooks Oil appeals from those judgments raising numerous assignments of error. Wilburn Oil cross-appeals, claiming the trial court erred by denying its motion for costs and attorneys' fees under Mississippi Code Section 11-53-81 (Rev. 2019) (the open-account statute).

¶2.     We find that the jury's verdict in favor of Wilburn Oil on the open-account suit was without evidentiary basis; therefore, we reverse the judgment entered on that verdict and remand for a new trial on damages as to Brooks Oil's open-account claim. This also requires a new jury to determine the enforceability of the two guaranty agreements. We affirm the trial court's denial of Wilburn Oil's motion for costs and attorneys' fees under Section 11-53-81.

## FACTS AND PROCEDURAL HISTORY

¶3.     This case was previously before the Court on interlocutory appeal solely on the guaranties suit. *See **Tommy Brooks Oil Co. v. Wilburn (Wilburn I)***, 243 So. 3d 166 (Miss. 2018) (staying the open-account suit per this Court's November 30, 2016 order). This Court reversed the trial court's grant of summary judgment in favor of Jerry Wilburn and remanded the case for further proceedings because Jerry "Wilburn did not meet his summary-judgment burden . . . ." *Id.* at 167. ***Wilburn I*** provided the following background in the case:

> Through the years, Brooks Oil supplied Wilburn Oil with fuel products
> at a number of Wilburn Oil's gas stations. Since late 2012, though, Wilburn

2

Oil—according to Brooks Oil—had failed to pay all the fuel invoices sent by Brooks Oil. Brooks Oil claimed that Wilburn Oil owed it nearly $1 million in unpaid fuel bills by 2013. In order for Brooks Oil to resume selling Wilburn Oil fuel products, Wilburn signed two personal guaranties to Brooks Oil's benefit. The first guaranty, executed on June 20, 2013, was for $100,000. The second guaranty, executed on August 29, 2013, was for $150,000. Aside from the amount guaranteed, the language of the guaranties was identical and provided that [Jerry] Wilburn guaranteed to Brooks Oil that he personally would be liable for Wilburn Oil's debt "due or to become due . . . now existing or hereafter arising . . . ." Before resuming delivery, Brooks Oil had Wilburn Oil also agree to a two-cent-per-gallon increase in the purchase prices for fuel products. The increase was to be applied to Wilburn Oil's outstanding invoices.

*Wilburn*, 243 So. 3d at 167-68 (alteration in original).

¶4.     In 2014, Brooks Oil sued Jerry Wilburn individually, claiming that "Wilburn Oil was not paying the outstanding invoices and sought to collect from [Jerry] Wilburn on the personal guaranties." *Id.* at 168 (referring to complaint as the "guaranties suit"). Brooks Oil then sued "Wilburn Oil for the unpaid fuel invoices (the 'open account suit')[ ] . . . claim[ing] there were $984,078.02 in unpaid invoices[, from September 2012 through January 2013.]" *Id.* at 169. Wilburn Oil did not answer the complaint, and "Brooks Oil was awarded a default judgment of $1,184,272.52." *Id.* The trial court thereafter "set aside the default judgment and consolidated the open-accounts suit with the guaranties suit." *Id.*

¶5.     After some discovery, Jerry Wilburn moved for summary judgment, claiming that neither party had intended for the guaranties to apply to past debt and that there was either a mutual mistake or a unilateral mistake. *Id.* at 168. Jerry Wilburn submitted testimony from both his and Tommy Brooks's depositions. *Id.*

¶6.     "Brooks Oil disputed [Jerry] Wilburn's claims, pointing to the guaranties' language

3

covering existing debts" and argued there were genuine issues of material fact as to the parties' intent. *Id.* at 169. Brooks Oil sought to clarify Tommy Brooks's deposition testimony by submitting two affidavits, one from Tommy Brooks and one from Brooks Oil's secretary and treasurer, Lee Brooks Murphree. *Id.* Jerry Wilburn moved to strike both affidavits, claiming they were both self-serving and unsupported by relevant material facts. *Id.*

¶7. Following a hearing, the trial court granted Jerry Wilburn's motion to strike the affidavits. *Id.* Thereafter, the trial court granted Jerry Wilburn's motion for summary judgment and dismissed Brooks Oil's suit against Jerry Wilburn in the guaranties suit. *Id.* Brooks Oil filed an interlocutory appeal, which this Court granted. *Id.* This Court also stayed the open-account suit pending resolution of the interlocutory appeal. *Id.*

¶8. On appeal, this Court found that genuine issues of material fact existed on what debt the parties intended the guaranties to cover and whether there was a mutual mistake as asserted by Jerry Wilburn. *Id.* at 171. This Court found there was no evidence to support Jerry Wilburn's alternative argument that both guaranties contained unilateral mistakes. *Id.* Further, "[b]eyond entering into the guaranties, Wilburn Oil and Brooks Oil agreed to a two-cent-per-gallon increase to fuel prices to pay down the existing Wilburn Oil debt—evidencing the fact that Wilburn Oil's past debt concerned Brooks Oil." *Id.*

¶9. After remand, Brooks Oil filed separate motions for summary judgment against Wilburn Oil for $984,078.02 in open-account debt and Jerry Wilburn individually for enforceability of the guaranty agreements up to $250,000 of all debt owed by Wilburn Oil.

4

Wilburn Oil also filed a motion for summary judgment asserting that he "is entitled to judgment as a matter of law [on] all claims asserted against it." The trial court denied each motion. Brooks Oil filed a petition for interlocutory appeal, which this Court denied.

¶10. Trial began in June 2021 but resulted in a mistrial after opening statements when Brooks Oil referenced two unrelated law suits filed by Maples Gas Company against Wilburn Oil and Jerry Wilburn for failure to pay for fuel. Trial began again in February 2022.

¶11. According to the evidence presented at trial, Tommy Brooks and Jerry Wilburn were lifelong friends. Tommy started Brooks Oil, which primarily distributes fuel to convenience stores in North Mississippi and Alabama, in 1966.

¶12. Jerry Wilburn approached Tommy Brooks in February 2011, needing Brooks Oil to supply his stores with fuel because Wilburn Oil's previous supplier had stopped supplying fuel to Wilburn Oil due to a dispute. Based on a handshake between the two friends, Brooks Oil agreed to sell fuel to Wilburn Oil, and Wilburn Oil agreed to pay Brooks Oil's cost for the fuel, plus one cent per gallon.

¶13. Wilburn Oil thereafter placed hundreds of orders totaling millions of dollars but, according to Brooks Oil, fell significantly behind on its payments. In March 2013, according to Brooks Oil, Murphree and Wilburn Oil's employee Renee Webb conducted a joint review of the account. The records showed that Wilburn Oil owed Brooks Oil approximately $1.3 million in debt.

¶14. Wilburn Oil then paid $200,000 toward the debt and began paying an additional two cents per gallon on future orders to go toward past debt. As mentioned, to continue selling

fuel to Wilburn Oil, Brooks Oil required Jerry Wilburn to guaranty a portion of the debt. Jerry Wilburn executed two personal guaranties: the June 2013 guaranty for $100,000 and the August 2013 guaranty for an additional $150,000.

¶15. Subsequently, Wilburn Oil's orders for fuel declined. In April 2014, Brooks Oil required Jerry Wilburn to execute an unlimited guaranty of the entire debt to continue to selling fuel to Wilburn Oil. Jerry Wilburn refused to do so, and the parties ceased doing business effective April 2014.

¶16. As of May 2014, Brooks Oil's records showed that Wilburn Oil owed $984,078.02 for 104 specific invoices dating from September 27, 2012 to June 25, 2013. The majority of these invoices were for the month of January 2013.

¶17. Brooks Oil presented evidence at trial through testimony[1] and numerous exhibits. Kim Cheney, who worked for Brooks Oil from 1995 to July 2014, handled the Wilburn Oil account during the entirety of the relationship—February 2011 to April 2014. Cheney testified how Wilburn Oil placed its order and was billed for fuel: (1) Wilburn Oil would place an order with Brooks Oil by telephone or email; (2) Brooks Oil would send one of its tanker trucks to a loading rack, where fuel is delivered either by pipeline or river barges, or Brooks Oil would hire an outside carrier to fulfill the order; (3) the tanker truck then delivered the fuel to a specified Wilburn Oil location (nine total); (4) Brooks Oil received the bill of lading showing the delivery of fuel to Wilburn Oil and a commercial invoice from Brooks Oil's supplier showing what Brooks Oil was charged; (5) Brooks Oil added one cent

---

[1] Tommy Brooks died prior to trial.

per gallon[2] to its cost for the fuel and generated an invoice for Wilburn Oil by putting the information into Brooks Oil's computer system; (6) Brooks Oil, as a "routine practice," would send an invoice to Wilburn Oil within three days by fax upon receiving an invoice from its supplier.

¶18. Cheney said that it would take a couple of days for Brooks Oil to receive an invoice from its supplier, so Wilburn Oil would pay an estimated amount after the fuel was delivered. Initially, Wilburn Oil would put money into Brooks Oil's bank account. Then Brooks Oil started drafting Wilburn Oil's bank account, which is what Brooks Oil's supplier did with Brooks Oil's account for the fuel Brooks Oil had purchased for delivery to Wilburn Oil. Cheney said Brooks Oil was on a ten-day payment term with its supplier.

¶19. Cheney said there were several instances in which the electronic fund transfers (EFT) from Wilburn Oil were returned due to insufficient funds. She also testified that she had to send the same invoice to Wilburn Oil on multiple occasions and that Wilburn Oil fell behind on payments. When payments were received by Brooks Oil, they would be logged into Brooks Oil's computer system within two days.

¶20. Murphree testified that Brooks Oil recognized in early 2013 that Wilburn Oil was significantly behind on the account. Murphree conducted a joint review of the account with Webb to determine the exact amount owed by Wilburn Oil. She said that at the conclusion of the joint review, the records showed that as of March 5, 2013, Wilburn Oil owed Brooks Oil approximately $1.3 million. This amount was disclosed to Wilburn Oil in a meeting in

---

[2] According to the record, a typical tanker holds anywhere from 8,300 to 8,400 gallons of fuel.

early March 2013 involving Murphree, Tommy Brooks, Jerry Wilburn, and Webb.

¶21.   Thereafter, according to Brooks Oil, Wilburn paid $200,000 toward the existing debt on March 6, 2013, and Wilburn Oil agreed to pay an additional two cents per gallon for all future purchases to credit toward the existing debt. Afterward, Wilburn Oil began paying the exact amount of each future invoice instead of an estimated amount as was done previously.

¶22.   Wilburn Oil presented two witnesses at trial, Jerry Wilburn and his son-in-law Chuck Wood. Both testified as adverse witnesses during Brooks Oil's case-in-chief, and both testified during the defense's case-in-chief. Webb, who conducted the joint review of the account with Murphree, did not testify.

¶23.   Jerry Wilburn testified that the agreement between him and Tommy Brooks was that Wilburn Oil had four days to pay an invoice submitted by Brooks Oil, or he would be cut off. Jerry Wilburn claimed that they paid what they were told to pay every time. He said that if there was not enough money in the bank to pay what Brooks Oil said to pay, he would make an arrangement with his bank to take care of it, or he would borrow money from somebody else to make sure the bill was paid.

¶24.   Wood testified that he was vice president of Wilburn Oil since 2011; he left the company in September 2013. Wood ran Wilburn Oil's Tupelo office, and with regard to Wilburn Oil's relationship with Brooks Oil, Wood said his primary role was to order fuel and make sure the payments were made in full.

¶25.   Wood said he would either call or email Cheney when ordering fuel. Wood did not keep records of the orders he made through Cheney, rather Wilburn Oil relied on the bills of

8

lading and invoices from the loads of fuel received from Brooks Oil as its records. He said others in the office were responsible for keeping the books, the accounts receivable, and the accounts payable. Wood also said he did not personally keep up with the invoices faxed from Brooks Oil.

¶26. While testifying as an adverse witness, Wood corroborated Cheney's and Murphree's testimonies regarding the pay arrangement between Brooks Oil and Wilburn Oil. He said that at the beginning of the business relationship, they initially tried to pay the exact amount "on the day that the load was pulled." But they were unable to do so "due to the timing and just the nature of the beast[.]" Wood said that because "bill of ladings could not be sent to Brooks by those entities in which those things were being created, . . . we could not ever get a full total exact amount given."

¶27. Wood testified that although he had left Wilburn Oil by the time Brooks Oil filed its lawsuits against the company, he personally pulled the documents requested by Jerry Wilburn's counsel. Wood said he reviewed the list of invoices that Brooks Oil said had not been paid and said that "there are payments that we were not given credit for that we made for that." Wood also said, "I know there was documents that we did not have, invoice documents, bill of lading documents that we did not have prior to the claim being filed against Wilburn Oil." Of the 104 invoices Brooks Oil claimed were unpaid, Wood was asked if he knew which ones Wilburn Oil had or had not received. Wood said he did not know.

¶28. Wood said he was not privy to the meetings with Brooks Oil in March 2013 concerning the alleged debt. He said that Jerry Wilburn and Webb both worked with Brooks

9

Oil "to figure out where the discrepancy was and there never was a conclusion to that discrepancy until - - well, there's still not - - never a conclusion reached that I'm aware of and then a suit was filed."

¶29.    When asked by Brooks Oil if it is "your contention that Wilburn Oil doesn't owe any money to Brooks Oil," Wood stated:

> You know, the whole thing boils down to, you know, I paid the invoices that were asked to be paid in full every time they were asked to be paid. I've yet to - - I never received a full or never saw that we received all the invoices that [they] said we owed, so until - - until our accounts receivable people and Mr. Wilburn told me that there was a definite answer whether it was a plus or minus, I didn't - - I never have and never will make an assumption that we owed any money.

¶30.    When asked about his prior testimony that he believed Wilburn Oil had overpaid Brooks Oil, Wood stated:

> From the records that we have that were collected there's – from what I have calculated myself and I'm no CPA but I do have notes where I looked and taken information that was given, I have found discrepancies where we weren't given credit. So there's no way – if you asked me personally, and I'll say this in front of a jury or I'll tell you on a street corner, if you ask me personally I don't see how we could have owed any money because we paid in full – every time we were asked to pay an invoice we paid in full. Now there were a few times we might have fell short and the bank account was short but we always the next day made sure that went through whether it was contacting our banker and making things happen we made sure that payment was made. So I have a hard time seeing where we could owe that amount of money. If we got behind on one payment, it got returned, we got cut off. So if we got cut off for one payment being missed how in the world did – it's unfathomable how we owe nine hundred thousand dollars.

¶31.    During Wilburn Oil's case-in-chief, both Jerry Wilburn and Wood maintained that Wilburn Oil always paid (or eventually paid) what Brooks Oil told them to pay. Both also testified that Wilburn Oil had continuous problems getting invoices from Brooks Oil in a

10

timely manner despite Cheney's testimony that it was Brooks Oil's "routine practice" to send a particular invoice within a three-day period. They said that Brooks Oil sometimes did not provide them an invoice until two, three, and even six weeks after the three-day period.

¶32.   During Wood's testimony, he pointed to four of the 104 invoices and testified that the dates indicated on the invoices show that Wilburn Oil did not receive that particular invoice within a three-day period. For example, the date for Invoice 137001 was "10/09/2012." The print date for this invoice was "Tuesday, November 13, 2012." And the fax date for this invoice was "11/21/2012 WED." Wood said that these dates denoted on Invoice 137001 showed that Wilburn Oil did not receive this invoice until almost six weeks after it was generated.

¶33.   Wood also testified that these same four invoices showed that Brooks Oil had not properly credited each payment from Wilburn Oil. Wood compared a spreadsheet prepared by Murphree showing Brooks Oil's records of deposits from Wilburn Oil to the dates of these four invoices. Wood noted for example that Invoice 137001 showed the amount of $7,563.40. Wood then pointed to page 13 of Exhibit D-9, which listed deposits by Wilburn Oil on October 10, 2012, of $50,000, October 11, 2012, of $50,000, and October 13, 2012, of $40,000.

¶34.   The following exchange then occurred between counsel for Wilburn Oil and Wood:

> Q.   And so within the terms of the agreement, the payment within three days that's $140,000 during those three days that was paid; is that correct?
>
> A.   Yes, sir, that's correct.

11

Q.    What's the amount on this invoice?

A.    The amount on the invoice is $7,563.40?

Q.    So what does that tell you?

A.    It tells me that within the time frame that we would be paying those invoices that we had made sufficient amount of payment to cover the $7,563.40.

Q.    And this is an invoice that's listed on P-3 saying it's unpaid, correct?

A.    That's correct.

¶35.    On cross-examination, Wood was asked, "if Brooks Oil's record show that the deposits on October 10th, 11th, and 12th were credited to other invoices that were owed by Wilburn Oil, then your testimony that [the] invoice in D-3 should have been paid would be incorrect?"

¶36.    Wood replied, "Well, my testimony wouldn't be incorrect.  I'm telling you what I believed should have happened by the payment methods that were given.  If there were past-due invoices that were out there that we were not aware of that they were posting payments to that was beyond my knowledge and I can't attest to that."

¶37.    On rebuttal, in response to Wood's testimony, Murphree pointed to the "Customer Payments Report" (Exhibit P-34) for the main fuel account.  On page 43, she identified the October 11, 12, and 13 deposits, and she identified the invoices that had been credited with the deposits, which did not include Invoice 137001.  Murphree testified that on "October 10th, there was a deposit made for $50,000."  It was applied to five invoices.  "Four of them were dated September the 10th and one of them is dated September the 11th of 2012."

12

According to Exhibit P-34, the invoice numbers that were credited were 135437, 135438, 135439, 135441, and 135449. Murphree said she could demonstrate this for each of the deposits listed in Exhibit D-9 and show how each was credited to specific invoices by Brooks Oil.

¶38. After a four day trial, the jury returned a verdict after forty-five minutes of deliberation, handwritten as follows:

* <u>Wilburn Oil Company</u>, <u>Inc</u>.

We the Jury find[] for Defendant Jerry Wilburn.

* <u>Jerry Wilburn</u>

We the Jury find[] for Defendant Jerry Wilburn.

¶39. The trial court entered two separate judgments in favor of Wilburn and Wilburn Oil, respectively. The trial court denied Brooks Oil's post-trial motion seeking a JNOV, or, in the alternative, a motion for a new trial pursuant to Rules 50(b) and 59(a) of the Mississippi Rules of Civil Procedure. The trial court also denied Wilburn Oil's motion for costs and attorneys' fees.

¶40. As will be explained, Brooks Oil demonstrated a prima facie case of open-account debt owed to it by Wilburn Oil. And Wilburn Oil failed to meet its rebuttal burden by showing it owed no debt to Brooks Oil on the open account. Accordingly, Brooks Oil was entitled to a JNOV on its open-account claim. Because the jury did not reach the issue of damages, we reverse and remand for a new trial on damages.

¶41. Further, the jury's verdict on the open-account claim nullified Brooks Oil's claim

13

regarding the two guaranty agreements. Therefore, a new jury will have to determine the enforceability of those agreements.

## DISCUSSION

¶42. Review of a trial court's denial of a JNOV is de novo, and the evidence is reviewed in the light most favorable to the nonmoving party. *Mine Safety Appliance Co. v. Holmes*, 171 So. 3d 442, 449 (Miss. 2015). This Court "will reverse [only] if the evidence, as applied to the elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated." *Id.* (alteration in original) (internal quotation mark omitted) (quoting *Sherwin-Williams v. Gaines ex rel. Pollard*, 75 So. 3d 41, 43 (Miss. 2011)).

¶43. There is no dispute that the parties were operating under an open-account agreement. "An open account is a type of credit extended through an advance agreement by a seller to a buyer which permits the buyer to make purchases without a note of security and is based on an evaluation of the buyer's credit." *Cox v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 619 So. 2d 908, 914 (Miss. 1993) (citing *Open Account*, Black's Law Dictionary (5th ed. 1979)). Generally, it is "an account based on continuing transactions between the parties which have not been closed or settled but are kept open in anticipation of further transactions." *Westinghouse Credit Corp. v. Moore & McCalib Inc.*, 361 So. 2d 990, 992 (Miss. 1978).

¶44. A prima facie case is made on an open-account case based upon proof offered by the creditor. *Natchez Elec. & Supply Co. v. Johnson*, 968 So. 2d 358, 360 (Miss. 2007). Once

14

the creditor offers a prima facie case, the burden shifts to the debtor to prove that the claim is incorrect. *Id.*

¶45. At trial, Brooks Oil introduced 104 invoices it claimed that Wilburn Oil had not paid. The 104 unpaid invoices pertained to five of the nine accounts with Wilburn Oil.[3] Brooks Oil also produced a listing of each invoice ever issued to Wilburn Oil for all nine of Wilburn Oil's accounts with Brooks Oil. Like the listing of the 104 unpaid invoices, these records identified the invoice date, invoice number, amount, payments credited, balance, and running total owed.

¶46. Brooks Oil also produced a listing of each payment ever received from Wilburn Oil through an accounting record for each of the nine accounts. The total of all the invoices issued to Wilburn Oil came to $33,545,745.85. The total for all the payments received from Wilburn Oil came to $32,561,676.83, leaving a balance of $984,078.02, the total amount Brooks Oil claimed was owed for the 104 invoices attached to its open-account complaint. Murphree testified that the amount sought was for reimbursement of fuel charges already paid by Brooks Oil to its supplier ($872,094.44) and taxes already paid by Brooks Oil ($119,989.49) in 2012 and 2013.

¶47. Brooks Oil submitted its business records for each of the 104 invoice transactions. These records included copies of the bills of lading, supplier invoices, supplier bills of

---

[3] These five accounts are designated as follows: Wilburn Oil Main, Coussons, Oakland, Waterloo, and County. According to Wood, some of these accounts were consignment operations under which somebody else owned the property and/or store, and Wilburn Oil owned the fuel tanks, the pumps, and the canopies. Wood said the Wilburn Oil Main account concerned Mississippi locations, and the four others were Alabama locations.

lading, and the delivery records for each of the orders identified in the 104 invoices.

¶48.   Through the testimonies of Cheney and Murphree, Brooks Oil attested as to how these account records were created and their accuracy.

¶49.   For its part, Wilburn Oil did not dispute having received any of the fuel that Brooks Oil claimed it had supplied to Wilburn Oil.  Nor did Wilburn Oil submit any of its own accounting or business records at trial.  Wilburn Oil had sought to submit its bank records, but the trial court excluded these records from trial because Wilburn Oil did not timely provide them to Brooks Oil during discovery.

¶50.   Instead, Wilburn Oil proceeded at trial with two assertions that it maintained against Brooks Oil throughout the trial.  One, because there was evidence that Wilburn Oil did not always receive invoices from Brooks Oil in a timely manner, Brooks Oil failed to comply with the requirements set forth in *Natchez Electric*.  Two, Wilburn Oil could not possibly owe any debt to Brooks Oil because it always paid, or eventually paid, what Brooks Oil told it to pay "each and every time it received fuel from" Brooks Oil.

¶51.   Neither the record evidence nor the law supports either assertion, which we will discuss separately.

**Assertion One**

¶52.   According to Wilburn Oil, based on *Natchez Electric*, in order to state a case under an open account, a plaintiff must (1) show "actual ledger cards or entries showing each debit and credit" on the defendant's account; (2) show, through testimony of its manager or representative, "the simultaneous business machine posting and invoice billing" to the

16

customer; (3) show the correctness and accuracy of the entries, and (4) show that "all materials represented by the entries had been delivered to defendant[.]" *Natchez Elec.*, 968 So. 2d at 360-61 (quoting *Prestype, Inc. v. Carr*, 248 N.W.2d 111, 119 (Iowa 1976) (quoting *Gardner & Beedon Co. of Springfield v. Cooke*, 513 P.2d 758 (Or. 1973))).

¶53.    Wilburn Oil claimed at trial that Brooks Oil failed to comply with the second requirement provided by *Natchez Electric*, which says that the plaintiff must show "the simultaneous business machine posting and invoice billing of the customer[.]" *Id.* (quoting *Carr*, 248 N.W.2d at 119). According to Wilburn Oil, because Brooks Oil did not provide an invoice to Wilburn Oil at the time the order for fuel was made or when it was delivered and because there was evidence showing a large number of days between the date of the invoice and when it was sent to Wilburn Oil, Brooks Oil failed to meet the standard set forth in *Natchez Electric*. Therefore, Brooks Oil failed to establish a prima facie case for its open-account claim.

¶54.    Wilburn Oil misconstrues *Natchez Electric*, a case that actually supports Brooks Oil's case against Wilburn Oil. At the outset, *Natchez Electric* cited the two Iowa and Oregon cases merely by way of example as to the type of proof needed to demonstrate a prima facie case for an open account. What the Iowa and Oregon courts actually related in their respective opinions were the types of evidence provided by the creditor in those particular cases to demonstrate a prima case for an open-account action. The following from the Oregon Supreme Court illustrates:

> It is our conclusion that plaintiff's actual ledger cards showing each entry of debit and credit, the testimony of plaintiff's manager showing the simultaneous

17

business machine posting and invoice billing of the customer, his testimony concerning the correctness of the entries, and his testimony that all materials represented by the entries had been delivered to defendant **constitute sufficient evidence to make a Prima facie case**.

*Gardner*, 513 P.2d at 759 (emphasis added).

¶55.   *Natchez Electric* did not establish an absolute requirement or standard as to what is required to prove an open-account claim.  What is required in any open-account case is sufficient proof of the alleged debt.  The evidence necessary for such proof may vary depending on the type of business engaged in and the course of conduct between the parties. *See, e.g.*, *Natchez Elec.*, 968 So. 2d at 362-63 ("When Johnson began paying on the account for items purchased on delivery tickets that were not signed by himself or his employees, he ratified this course of conduct in the performance of the contract.").

¶56.   While "simultaneous . . . invoice billing of the customer" may be an ideal accounting method or business practice, it is not a realistic or practical one for numerous types of businesses.  *Natchez Elec.*, 968 So. 2d at 361 (quoting *Carr*, 248 N.W.2d at 119).  Indeed, one of Mississippi's federal district courts applied *Natchez Electric* to an open-account case before it and rejected this specific language.  In an unpublished opinion, the district court provided as follows:

> [T]he Mississippi Supreme Court has employed an open account framework in which, in order to make a prima facie showing, a plaintiff must present detailed account ledgers and offer testimony as to the accuracy of the ledger entries, **the temporal relationship between the ledger entries and the actual events they represent**, and the delivery of the materials represented by the entries.

*Cardinal Health 110, Inc. v. Smithville Pharmacy, Inc.*, No. 1:08CV67, 2009 WL 1298218,

18

at *3 (N.D. Miss. May 8, 2009) (emphasis added) (not reported).

¶57.    Here, Brooks Oil provided a detailed record of its financial transactions with Wilburn Oil, identifying each payment received from Wilburn Oil and how each payment was applied to specific invoices for fuel. Brooks Oil demonstrated how these invoices were generated in its computer system, how they were married to the bills of lading (which show proof of delivery of the product purchased by Wilburn Oil), and that these invoices were delivered to Wilburn Oil.

¶58.    Brooks Oil introduced each bill of lading that corresponded with each of the 104 alleged by unpaid invoices. Brooks Oil provided testimony as to how a bill of lading is created and what it contains. The bill of lading is created at the loading rack where the fuel truck is loaded. It contains the type of fuel and the amount of fuel loaded onto the truck, and it provides the fuel's destination. Each bill of lading contains the driver's name, when the fuel was delivered, and a signature by someone who received it at its destination.[4]

¶59.    If one of Brooks Oil's drivers delivered the fuel, Cheney would receive the bill of lading from that driver, enter it into Brooks Oil's computer system, which in turn generated the invoice for that fuel delivery. If Brooks Oil hired another carrier to deliver the fuel, Cheney would obtain the bill of lading from that carrier, enter it into the system, and generate the invoice. Brooks Oil would then send the invoice (via fax) to Wilburn Oil, typically within three days.

---

[4] According to Murphree, not every bill of lading is signed because the store might be closed when a driver makes a delivery. She said this is standard practice because there is documentation that the fuel was picked up.

¶60.    Brooks Oil introduced the commercial invoices it received from its supplier. These show the amount of fuel the driver picked up at the loading rack and how much the supplier charged Brooks Oil for the fuel. These too contain a bill-of-lading number that corresponds with the bill of lading received by Brooks Oil.

¶61.    Brooks Oil submitted a record of every payment received by Wilburn Oil throughout its relationship with Brooks Oil, called a "Customer Payments Report." Murphree testified that the report shows the payments by Wilburn Oil and what invoices it paid. She said that when a payment is entered into Brooks Oil's computer, you go to the customer's account, which shows what is outstanding, and it allows you to apply that payment to the outstanding invoice. Murphree explained by example that if a $100,000 deposit is made, $80,000 may go to one of Wilburn Oil's accounts, and $20,000 may go to another of Wilburn Oil's accounts. Murphree testified that the payments by Wilburn Oil were credited to the oldest invoice and that you have to look at all the accounts to make a balance.

¶62.    Significantly, there was no simultaneous invoice billing in this instance due to the pay arrangement agreed to by the parties from May 2011 to March 2013. During this period, Wilburn Oil paid Brooks Oil estimated even amounts for shipments of fuel prior to receiving an itemized invoice or bill for the fuel.

¶63.    Without question, this pay arrangement would lead to much trouble for these parties. But it is what they agreed to in the performance of their unwritten contract for supplying fuel to Wilburn Oil's stores. *See **Natchez Elec.***, 968 So. 2d at 362-63 (explaining how parties can establish an unwritten contract for the sale of goods by conduct and course of dealing).

20

¶64. As Wood testified, at the beginning of the business relationship, they initially tried to pay the exact amount "on the day that the load was pulled." But they were unable to do so "due to the timing and just the nature of the beast[.]" Wood said that because "bill of ladings could not be sent to Brooks by those entities in which those things were being created, . . . we could not ever get a full total exact amount given."

¶65. Although Wood and Jerry Wilburn admitted at trial that neither of them ever dealt with the faxed invoices sent from Brooks Oil, both claimed that Wilburn Oil often had trouble receiving invoices in a timely manner. Brooks Oil, however, provided testimony that it had to send the same invoice to Wilburn Oil numerous times, which created new print dates and fax dates.

¶66. This factual dispute between the parties was of no consequence in the case. Even if Wilburn Oil did not, in fact, receive a particular invoice in a timely manner, this alone did not mean that the invoice was incorrect. Nor did it excuse Wilburn Oil from owing on the fuel it admittedly had received as identified by the invoice and the bill-of-lading number.

¶67. Based on our review of the record, Brooks Oil presented sufficient evidence to make a prima facie case for its open-account debt claim against Wilburn Oil. Brooks Oil demonstrated the "relationship" between its record entries and the "events they represent[ed]." *E.g.*, **Cardinal Health**, 2009 WL 1298218, at *3. Brooks Oil's evidence described the standard practice of doing business with Wilburn Oil. And Brooks Oil submitted testimony attesting to the accuracy of the invoices sent to Wilburn Oil for payment. Accordingly, the burden shifted to Wilburn Oil to demonstrate that the debt amount was

21

incorrect.

¶68.     Wilburn Oil's assertion at trial that Brooks Oil failed to comply with the requirements set forth in *Natchez Electric* and therefore failed to make a prima facie case for open-account debt owed by Wilburn Oil was without basis in fact and law.

**Assertion Two**

¶69.     Wilburn Oil contended at trial, and maintains on appeal,[5] that even if Brooks Oil demonstrated a prima facie case, Wilburn Oil overcame it by showing that Brooks Oil's claim was incorrect.  Wilburn Oil submits that the proof at trial was uncontroverted that Wilburn Oil paid in full the amount it was informed to pay by Brooks Oil "each and every time it received fuel from [Brooks Oil]."

¶70.     Again, the record belies this assertion.  As mentioned, Wilburn Oil did not submit any of its own accounting or business records at trial.  Instead, Wilburn Oil relied on the testimony of Jerry Wilburn and Wood for the claim that Brooks Oil's records were incorrect because Wilburn Oil always paid or eventually paid what Brooks Oil told it to pay.

¶71.     This, according to Wilburn Oil, was shown by Cheney's and Murphree's own testimonies.  For example, Cheney was asked on cross-examination, "Now, you would tell [them] what to pay and they would pay?"  Cheney responded, "Uh-huh (indicating yes)."  Murphree was asked by defense counsel: "in 2013, the Wilburns were continuing to pay what they were asked to pay in January of 2013, weren't they?"  She replied: "Whatever Kim told

---

[5]   Wilburn Oil and Jerry Wilburn filed a motion to correct a minor, inadvertent omission in their brief to this Court.  Because the change does not prejudice Brooks Oil, this Court grants the motion.

them to pay they would pay, that's correct."

¶72.    Wilburn Oil also maintained throughout trial that the agreement between Jerry Wilburn and Tommy Brooks was that Wilburn Oil had three to four days to pay what Brooks Oil told them to pay or they would be cut off.  Wilburn Oil pointed to testimony from Cheney in which she said that when a payment or bank transfer was returned, she would inform Wilburn Oil that it had to get it paid before Brooks Oil would deliver any more fuel.  Wilburn Oil contended that because Brooks Oil continued supplying fuel to Wilburn Oil, "it would be impossible for Wilburn Oil to ever have a debt."

¶73.    But what the record illustrates is that the payments made by Wilburn Oil were not earmarked for specific invoices.  Rather, as shown by the Customer Payments Reports submitted by Brooks Oil and testimony from Murphree, the payments made were often applied to preexisting invoices and sometimes to invoices in one of Wilburn Oil's other nine accounts.  This resulted in partial payments being applied to certain invoices.

¶74.    For example, the report shows that Wilburn Oil made a payment of $55,000 on November 8, 2012.  It was applied to five different invoices dated October 22, 23, and 24, 2012.  One of the invoices was 137109, which totaled $16,592.07.  Brooks Oil applied $5,599.86 of the $55,000 November 8 payment to invoice 137109 on October 22.  This left a remaining balance of $10,992.21 for that invoice.  On November 30, 2012, Wilburn Oil made a payment of $28,000.[6]  Brooks Oil applied $10,992.21 of that $28,000 payment to the

_____

   [6] The Customer Payments Report shows that Wilburn Oil made thirteen other payments between November 8 and November 30, 2012: November 9, $30,000; November 13, $95,000; November 14, $25,000; November 15, $50,000; November 15, $55,000; November 19, $55,000; November 20, $45,000; November 21, $28,000; November 23,

remaining balance for invoice 137109, thereby closing it out. Murphree testified that this was the only way to run the account based on Tommy Brooks's and Jerry Wilburn's agreement that Wilburn Oil would pay estimated even amounts for shipments of fuel.

¶75. "As a general rule, a debtor paying money to his creditor has the primary and paramount right to direct the application of this money to such items or demands as he chooses." *Williams v. Stockstill*, 82 So. 2d 450, 451 (Miss. 1955) (internal quotation marks omitted) (quoting 70 C.J.S. *Payment* § 52). But "if a debtor directs no specific application of a payment, the creditor may apply the payment to any one of the two or more debts the debtor owes him or her in any manner necessary and appropriate to protect the creditor's interests . . . ." 70 C.J.S. *Payment* § 42 (footnotes omitted), Westlaw (database updated Mar. 2024).

¶76. No evidence was presented at trial that Wilburn Oil ever directed or requested that its payments to Brooks Oil be applied to specific invoices throughout the May 2011-to-March 2013 period. And given the payment structure agreed to by the parties, Brooks Oil had every right to apply the payments from Wilburn Oil in the manner it did.

¶77. This, again, resulted in partial payments being made to numerous invoices. And this fact alone contradicts Wilburn Oil's assertion that it could not possibly owe any debt to Brooks Oil because it always paid what Brooks Oil told it to pay. As the record illustrates, even if Wilburn Oil technically paid what Brooks Oil told it to pay, that does not mean Wilburn Oil had paid everything that was actually owed.

---

$75,000; November 26, $50,000; November 27, $35,000; November 28, $25,000; November 29, $50,000.

¶78. Also, as to Wilburn's Oil's contention that Cheney's and Murphree's testimonies corroborated Wood's and Jerry Wilburn's testimonies that Wilburn Oil always paid what Brooks Oil told them to pay, review of Cheney's and Murphree's entire testimonies show that they do not support what Wilburn Oil submits. Neither Cheney or Murphree said or indicated that by paying what Brooks Oil told it to pay, Wilburn Oil had paid everything that was owed.

¶79. Cheney said in her testimony that when an EFT payment by Wilburn Oil was returned for insufficient funds, Wilburn Oil "would pay what Mr. Brooks would ask them to pay in order to continue [doing] business with them." She also stated that "[t]here were times when we would stop sending fuel and Mr. Brooks and Mr. Jerry would decide and he may pay a certain amount and whatever."

¶80. Murphree simply testified that Wilburn Oil would pay what Cheney told it to pay. She maintained, however, that Wilburn Oil's payments resulted in partial payments. And both Murphree and Cheney testified that Wilburn Oil had fallen significantly behind with its payments in early 2013.

¶81. Lastly, while Wilburn Oil did not explicitly admit at trial that it owed Brooks Oil for any of the alleged 104 unpaid invoices, the record shows that Wilburn Oil did acknowledge that there was past debt. Immediately following the joint review by Murphree and Webb, Jerry Wilburn paid Brooks Oil $200,000 to go toward past debt. And he agreed to a two-cent-per-gallon increase on all future purchases to go toward past debt.

¶82. Also, Wood testified that he did not know if Wilburn Oil owed money or did not owe

25

money to Brooks Oil. He simply claimed that "[w]e didn't have the information we needed to paint the picture."

¶83. The picture showing that Wilburn Oil still owes Brooks Oil money for fuel it had received from Brooks Oil was painted at trial by Brooks Oil's records. And nothing that Wilburn Oil submitted at trial changed it.

¶84. In other words, Brooks Oil's evidence at trial made out a prima facie case of open-account debt owed to it by Wilburn Oil. The burden then shifted to Wilburn Oil to prove that it did not owe any debt to Brooks Oil. As the record demonstrates, Wilburn Oil failed to do so. Accordingly, Brooks Oil was entitled to a JNOV in its favor for its claim that Wilburn Oil remains liable to Brooks Oil for open-account debt owed.

¶85. Similar to what this Court found to be the case in *Natchez Electric*, the actual amount owed to Brooks Oil remains in question. The jury here did not determine any damages for Brooks Oil. And based on the evidence before us, we find "that reasonable jurors could disagree as to the amount owed." *Natchez Elec.*, 968 So. 2d at 363.

¶86. Further, because the jury's verdict on the open-account claim nullified Brooks Oil's claim regarding the two guaranty agreements, a new jury will have to determine the enforceability of those agreements.

¶87. Accordingly, we reverse the trial court's judgment denying Brooks Oil's motion for a JNOV, and we remand this case to the trial court for a new trial on the amount of damages and the enforceability of the two guaranty agreements. *Id.* "The new trial shall allow whatever evidence is necessary, under the rules, to be presented so that the parties may fairly

present and defend their claims accordingly." ***Baker & McKenzie, LLP v. Evans***, 123 So. 3d 387, 417 (Miss. 2013).

## CONCLUSION

¶88.    The verdict in favor Wilburn Oil on Brooks Oil's open-account suit is not supported by substantial evidence.  Having proved by substantial evidence that Wilburn Oil remains indebted to Brooks Oil for fuel purchased and delivered to it by Brooks Oil, Brooks Oil was entitled to a judgment in its favor as a matter of law for Wilburn Oil's open-account debt.

¶89.    We therefore reverse the trial court's judgment on both suits, and we remand the case for a new trial on damages and enforceability of the guaranty agreements.

¶90.    **ON DIRECT APPEAL: REVERSED AND REMANDED. ON CROSS-APPEAL: AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.  MAXWELL, J., NOT PARTICIPATING.**